[Crim. No. 6242. In Bank. Nov. 14, 1958.]

THE PEOPLE, Respondent, v. JAMES LEWIS
FELDKAMP, Appellant.

Charles Hollopeter, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

SPENCE, J.—Defendant entered a plea of guilty to murder of the first degree and, after proceedings pursuant to section

190.1 of the Penal Code, the jury returned a verdict imposing the death penalty. Thereafter, on the trial by jury of his plea of not guilty by reason of insanity, defendant was found sane. Defendant's motion for a new trial was denied and he was sentenced to death. The appeal to this court is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant and two other men, Joel Leyva Villas and Ambrose Lucero, were jointly charged with the murder. Villas waived a trial by jury and submitted his cause to the court on the transcript of the proceedings taken before the grand jury. He was found not guilty. Lucero, a Mexican national, surrendered to the Mexican authorities at Tiajuana, but the record does not disclose the disposition made of the charge against him.

Defendant contends: (1) That his trial on the issue of punishment pursuant to section 190.1 of the Penal Code constituted prosecution under an ex post facto law; (2) that the evidence was insufficient to justify imposition of the death penalty; (3) that the evidence was insufficient to sustain the verdict that he was sane at the time of commission of the offense; and (4) that the trial court improperly excluded evidence relating to the issue of sanity. We have concluded that his contentions are without substantial merit.

It appears that Lucero, defendant's partner in numerous other robberies, suggested that they rob David Nagin and defendant agreed. Shortly after 7 o'clock on the evening of November 12, 1954, they proceeded to the Nagin home. Their first attempt was frustrated when defendant became frightened at the unexpected arrival by automobile of their intended victim as defendant approached the house. Defendant thereupon determined to abandon the robbery and left the scene. However, after Lucero's insistence they returned and entered upon the robbery according to plan. Lucero stationed himself at the rear of the house while defendant walked to the front entrance and rang the bell.

Nagin's daughter opened the door and was confronted by defendant, who had a gun in his hand. Nagin, who had been sitting in the living-room facing the door, rushed to his daughter and pulled her aside. The daughter screamed. At that instant, defendant fired once, wounding Nagin. As Mrs. Nagin ran into the hallway and attempted to help her husband, defendant fired three or four more shots, wounding Nagin and Mrs. Nagin, and grazing his own arm. Defendant backed

out the door, joined Lucero and fled. Nagin died before the police and ambulance arrived.

More than two years later—in July, 1957—defendant was apprehended in connection with another robbery. At that time he made a voluntary statement to police officers disclosing his part in the Nagin offense and numerous other robberies. Thereafter he entered the plea of guilty to murder in the first degree and requested a jury trial on the issue of the penalty, and also on his plea of not guilty by reason of insanity.

Section 190.1 of the Penal Code provides for a jury trial on the issue of penalty in those cases where the defendant is charged with an offense punishable alternatively by life imprisonment or death and is convicted by a plea of guilty. At that trial "evidence may be presented . . . of the circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty. The determination of the penalty . . . shall be in the discretion of the . . . jury . . . on the evidence presented. . . ."

Both the prosecution and the defense took full advantage of the provisions of that section. The defense introduced considerable testimony to the effect that defendant came from a broken home; that he had been living on his own and working at odd jobs in various localities from the time that he was 13; that his schooling had been meager; that he had served with distinction in the Korean War; and that as a result of his war experiences, he had developed a schizoid personality which manifested itself in violent reactions to loud screams, accompanied by loss of control and a retreat from reality.

Defendant testified that he had engaged in about one hundred robberies prior to the Nagin offense; that he had frequently carried a gun on those ventures; and that he had fired it at times as an automatic reaction to "too much commotion or excitement." Although defendant disavowed an intent to hit anyone, he admitted knowing that the weapon used by him in the Nagin offense was loaded and stated that he intended to use the gun if there was any resistance. Following a two-year respite after the murder, defendant attempted two more robberies in July, 1957. Both involved gunplay. He was apprehended on the second one.

Defendant first contends that the admission of evidence on his history and background and on matters in mitigation and aggravation was highly inflammatory; that such evidence would have been inadmissible prior to the enactment of section

190.1 of the Penal Code in 1957 (Stats. 1957, ch. 1968, § 2, p. 3509) ; and that the application of that section to a case involving an offense committed prior to its enactment falls within the constitutional prohibitions against ex post facto laws. (U.S. Const., art. I, § 10; Cal. Const., art. I, § 16.)

· This court considered this same argument in *People* v. *Ward*, 50 Cal.2d 702, 710-711 [328 P.2d 777], where it was said that the ''changes effected by the enactment [of section 190.1] constituted merely an alteration in the conditions deemed necessary for the orderly and just conduct of criminal trials and did not deprive the defendant of any substantial personal right within the meaning of the constitutional prohibitions of ex post facto laws.'' Moreover, if defendant had any rights which might have been violated by application of section 190.1, he may properly be deemed to have waived them by failing to make timely objection in the trial court. (See *People* v. *Dessauer*, 38 Cal.2d 547, 553-554 [241 P.2d 238] ; *People* v. *Martinez*, 154 Cal.App.2d 233, 235 [316 P.2d 14] ; *People* v. *Tenedor*, 107 Cal.App.2d 581, 583 [237 P.2d 679] ; *People* v. *Hazelwood*, 24 Cal.App.2d 690, 692 [76 P.2d 151].) Nor need there be any detailed consideration given here to the enumerated portions of the evidence now cited by defendant as having been improperly admitted. Defendant cannot now question the propriety of admitting such evidence, since it was introduced either by defendant (see *People* v. *Simmons*, 28 Cal.2d 699, 722 [172 P.2d 18]) or by the People without objection from defendant. (*People* v. *Stepp*, 82 Cal.App.2d 49, 51 [185 P.2d 417] ; 3 Cal. Jur.2d, Appeal and Error, § 156, p. 634.)

 Defendant next contends that the evidence was insufficient to justify the imposition of the death penalty in view of the ''abundance of facts in 'mitigation.' '' The jury is not required, however, to make its determination of the penalty on the basis of mitigating or aggravating circumstances. (See *People* v. *Brust*, 47 Cal.2d 776, 787 [306 P.2d 480].) And its determination of the penalty in light of the entire record and in accordance with the authority vested in it (Pen. Code, § 190.1) will not be disturbed on appeal. (*People* v. *Green*, 47 Cal.2d 209, 235 [302 P.2d 307] ; see also *People* v. *Thomas*, 37 Cal.2d 74, 77-78 [230 P.2d 351] ; *People* v. *Odle*, 37 Cal.2d 52, 55-59 [230 P.2d 345].)

Defendant's final two contentions concern the trial on the issue of his sanity at the time of commission of the offense. It

is conceded that defendant was sane when he entered the Nagin home with the intent to commit robbery, and that he then knew the nature of his act as well as the difference between right and wrong. The only dispute is whether defendant was sane or insane according to legal standards at the time he fired the gun at Nagin. Defendant claims that the evidence was insufficient to sustain a finding of sanity at that time, and that he was precluded from presenting pertinent testimony on that precise issue. There is a rebuttable presumption that defendant was sane at the time of commission of the crime (*People* v. *Baker*, 42 Cal.2d 550, 564 [268 P.2d 705]), and defendant had the burden of proving his insanity by a preponderance of the evidence. (*People* v. *Daugherty*, 40 Cal.2d 876, 901 [256 P.2d 911].) Defendant maintains that the scream of Nagin's daughter so unnerved him that he "panicked" and became an "automatic creature" or "robot," having no "conscious, rational control over his acts."

 Two medical experts gave opinions that defendant was sane at the time of commission of the crime. On cross-examination, defendant was permitted to pinpoint the sanity question in relation to the precise time of the homicide. Thus, one doctor was asked whether in his opinion defendant understood the nature and quality of his act "at the time he fired the gun and took the life of Mr. Nagin," and he answered in the affirmative. He then amplified his answer by stating his belief that defendant "had a consciousness of pulling the trigger," that "in the discharge of the gun he was reacting to [the] disturbance" of the girl's scream, and that the "firing was intended to quell or stop the disturbance and to facilitate his escape from the situation there." The other doctor was asked whether in his opinion defendant "was in fact unconscious immediately following the scream of the girl," and he responded that he did not think defendant "was unconscious in the way which could be said to cause him to be legally insane or not responsible." Defendant then recalled his own doctor to the witness-stand. The latter testified that in his opinion, defendant "did not know right from wrong at [the] moment" he killed Nagin; that at the time of the Nagin girl's scream defendant "became literally a robot"; that he "then did not have a conscious, rational control over his acts . . . [and] from that time until a definite period afterward . . . he was acting more or less as an automatic creature, a reflex animal." On cross-examination, defendant's doctor agreed

that in his opinion, defendant was sane before the scream, but that it was "the scream that triggered the firing." Thus there appears to have been a conflict in the evidence on the question of defendant's continued sanity throughout the entire episode at the Nagin home, including the precise time of the homicide. It is clear, however, that there was ample evidence in support of the jury's determination that he was legally sane during the entire time.

Defendant complains that, upon objection, he was not allowed to interrogate on recross-examination one of the court-appointed experts as to his opinion on defendant's state of mind "at the very instant that he fired the gun" and whether defendant "had any understanding or knowledge as to what he was doing when the gun was fired." But this question had already been asked of this witness and answered on cross-examination; and the court's exclusion of extended repetition of the same questions on recross-examination cannot be said to have constituted prejudicial error. In view of this conclusion, it is unnecessary to consider the further point made by the People in support of the trial court's ruling—that in view of defendant's admitted attempt to perpetrate a robbery, his admitted killing of Nagin during such attempt, and his admitted sanity during such attempt, at least until the instant that the girl screamed, the "time in issue on the question of sanity" under the felony-murder doctrine (Pen. Code, § 189) was not the time of the actual killing but the time when defendant "presented himself at the front door of the Nagin residence and menaced the girl with the gun with the intent to rob."

In conclusion, it is appropriate to state that our review of the record convinces us that defendant had a fair trial and that there was no prejudicial error committed in any of the proceedings.

The judgment and order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and McComb, J., concurred.