[Crim. No. 6477.   In Bank.   Nov. 3, 1959.]

THE PEOPLE, Respondent, v. DONALD LEONARD CASH, Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), John M. Moore and Richard W. Erskine, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

PETERS, J.—This is an automatic appeal, under the provisions of paragraph (b) of Penal Code, section 1239, from a judgment of death entered by the Superior Court, Los Angeles County, on a charge of murder in the first degree. Defendant pleaded "Not guilty" and "Not guilty by reason of insanity," waived jury trial,[1] and was tried by the court sitting without a jury. After a trifurcated trial, the court (1) found defendant guilty of murder in the first degree, (2) sentenced him to the death penalty, and (3) found him sane at the time of the commission of the offense.

The facts, insofar as they are pertinent to this appeal, are undisputed,[2] and are as follows:

---

[1] The waiver included the waiver of jury as to both the factual and the sanity issues, and was "expressed in open court by the defendant and his counsel." No problem arises either by reason of article I, section 7, of the Constitution or the provisions of Penal Code, section 190.1.

[2] Defendant neither took the stand, nor offered any evidence on his behalf, during the trial of the issue of guilt. As a result there can be no dispute as to the facts proved by the People.

Defendant for many years had been an irresponsible drifter who had never kept a job for any length of time. He had been in constant brushes with the law (only one of which—theft of an automobile—appears to have been a felony), all of which appear to have been associated with immoderate use of alcohol. He had twice unsuccessfully attempted suicide. He was once committed to Camarillo State Hospital. At the time of the murder he was 30 years old, and lived in a small house at the rear of the property owned by Etta Witherspoon, a 72-year-old widow. His relationship with Mrs. Witherspoon was cordial, and without incident. About eight days prior to the murder, defendant laid off work because of a minor injury. Instead of returning to work when the injury cleared up the next day, he spent the following week drinking and gambling. During this period he lost all of his pay and savings, wrecked his automobile to the extent that he was unable to have it towed away or repaired, and cashed two bad checks, one of which he forged on Mrs. Witherspoon's account.[3] Brooding over these facts, he continued to consume liquor, although he at no time became so drunk that he was unable to recall his actions. During the day and night preceding the murder he remained in his room drinking. At this time he again contemplated suicide but was unable to determine upon the method. He then decided that if he killed someone the State would take his life. He immediately went to the garage where he obtained an axe, and entered Mrs. Witherspoon's residence through the bedroom window (proximity is the only reason assigned for his choice of his landlady as victim). Mrs. Witherspoon was asleep, and he did not awaken her, but immediately and brutally dispatched her with the axe, using both the blunt and sharp ends. Many of the wounds were inflicted after death. Although sex had not been a part of the motive of the murder, defendant did, subsequent to his victim's death[4] form an intent to, and did attempt to have sex relations with the body, but was unable to consummate the same. Thereafter he returned to his apartment, bathed, redressed and returned to the scene

---

[3]The fact that this forgery might have supplied a motive for the senseless murder later described must be discounted, because the prosecution, which offered the only evidence on the subject, assigned an entirely different motive.

[4]Medical testimony derived from the autopsy and other exhibits proves, without doubt, that the sex attempts were subsequent to death of the victim. Furthermore, the People's witnesses do not ascribe sex as the motive, and the prosecution argued that sex was not a part of the motive for the crime.

. .

of the crime. From there he telephoned the police, reported the matter and waited for arrest. On arrival the police found him "calm" but in "a state of shock." Although he attempted to answer their questions, they could understand no word he said; that is, he spoke, but his words were meaningless. However, after arrest and some time spent in the county jail, he was able to and did cooperate with both the police and the appointed psychiatrists in recounting the details and reconstructing the facts.

As stated above, the trial was divided into three portions, the first embracing only the issues raised by the plea of "Not guilty," the second was confined to evidence going to the matter of penalty, and the third to the issue of "Not guilty by reason of insanity." During the trial of the first issue the prosecution offered a series of tape recordings of interviews between the police and defendant. Because the acoustics in the courtroom were not of the best, this portion of the trial took place, with the consent of both counsel, in the judge's chambers. The consent of defendant was given by his counsel, in the presence of defendant, who did not object. The judge, clerk, bailiff, reporter, defendant and both counsel were present in chambers, and after the tapes were played the trial was resumed in the courtroom. At the conclusion of the first portion of the trial the court found defendant guilty of murder in the first degree.

On the second, or penalty, phase of the trial the prosecution offered evidence of the checks, defendant testified in his own behalf and offered the reports and oral testimony of four psychiatrists, whose testimony, while contradictory, supports a finding that defendant was mentally ill, but not legally insane under the M'Naughton rule, both at the time of the crime and the time of their investigations. The prosecution rebutted with an additional psychiatrist. Thereupon the matter was submitted and the court imposed the death penalty.

In lieu of further testimony, the third issue was submitted, by stipulation, on all of the testimony and evidence produced on the trial of the second issue. The matter was fully argued and submitted, and the court found defendant to have been legally sane at the time of the commission of the crime.

Thereafter, a motion for new trial was argued and submitted. The sole point made on that motion was that the penalty should be reduced to life imprisonment.

Based upon the foregoing, appellant makes three contentions which are:

1. It is unjust to impose the death penalty on one who was mentally ill (just short of legally insane) at the time of the commission of the offense;

2. The trial court abused its discretion when it refused to reduce the penalty on motion for new trial;

3. Defendant was deprived of his constitutional right to a public trial in that he did not personally and expressly waive that right when court was held in the judge's chambers.

*Imposition of the Death Penalty*:

■ Appellant's counsel argues the immorality and injustice of the death penalty in circumstances such as are present. He points out that all of the psychiatrists agree that defendant was and is mentally ill, and that his illness takes a form which the layman, if not the law, would categorize as insanity. Appellant's argument admits that the court was justified in finding him guilty of murder in the first degree, and also that the evidence justifies a finding that he was legally sane as that condition is defined by the M'Naughton rule. Appellant's argument does not attack the court's action in imposing sentence, but merely attacks the imposition of the death penalty in lieu of life imprisonment. Since it was established that defendant committed a premeditated murder, while legally sane, the determination of the penalty was within the sole province of the trier of fact (Pen. Code, § 190.1), and in the absence of error the appellate tribunal has no power to upset that determination (*People* v. *Feldkamp*, 51 Cal.2d 237, 241 [331 P.2d 632] ; *People* v. *Green*, 47 Cal.2d 209, at p. 235 [302 P.2d 307] ).

*Ruling on Motion for New Trial*:

■ Appellant's second point could properly have been included with his first, for here he argues that the trial court abused its discretion in not reducing the penalty on motion for new trial. No reason is suggested for any distinction between the court's power to impose the death sentence in the first instance and its right to subsequently refuse to alter that sentence. Granted that Penal Code, section 1181, gives the trial court the *power* to modify its sentence on motion for new trial, nothing therein contained suggests a positive duty to so modify in the absence of any error or new matter not considered in the first instance. On the motion for new trial herein, appellant offered nothing new, merely repeating the arguments previously made in favor of life sentence. Therefore, it must be held that his claimed error regarding abuse

of discretion on motion for new trial is without merit for the same reasons set forth in answer to his point regarding imposition of death sentence in the first instance.

## Was Defendant Deprived of a Public Trial?

■ As his third, and last, point appellant argues that he was deprived of his constitutional right to a public trial in that he did not personally and expressly consent to the removal of the trial to chambers for the purpose of playing the tape recordings, even though the request to so move was made by his own counsel. The reason for moving to chambers was because the acoustics in the courtroom were poor. Defense counsel made the request in his client's presence, and appellant did not object. The full court (judge, clerk, bailiff, reporter, defendant and both counsel) took part in these sessions in chambers, and no objection was raised prior to appeal. Furthermore, there is nothing in the record to indicate that the sessions in chambers were not public. It is not claimed that the door between the courtroom and the chambers was closed, and there is no indication that any member of the press or public who desired access would have been barred from entering the chambers.

■ Appellant's argument is based upon the supposition that article I, section 13, of the Constitution of the State of California not only guarantees each accused a right to a public trial, but further guarantees that such right may not be waived except by a personally expressed waiver. This argument is based, in part, upon the fact that the right to a jury trial may not be waived except by an express personal waiver. But article I, section 7, expressly provides that defendant must personally join in the waiver of jury trial, whereas section 13, providing for a public trial, does not contain any such language or inference. On the contrary, it has long been held that the right to public trial may be waived without the expressed consent of either defendant or his counsel under circumstances where the court was cleared, the doors locked, and no complaint or objection was made at the time (*People* v. *Tugwell*, 32 Cal.App. 520 [163 P. 508]).

■ Furthermore, the trial court has discretion to close portions of the trial to the public, even without consent of or waiver by defendant, when there is good cause for such action based upon justice or protection of the parties. (See discussion in *Kirstowsky* v. *Superior Court*, 143 Cal.App.2d 745 [300 P.2d 163].) The authorities cited by appellant, although

indicating solid reason for adequate protection of public trial, are all distinguishable on the facts.

Moreover, it should be pointed out, there are no facts shown by the record to indicate that the trial was not public. The mere fact that a portion of the session was held in an adjoining room does not, of itself, indicate that the trial was not open to the public. In *People* v. *Terry*, 99 Cal.App.2d 579, at pp. 583-584 [222 P.2d 95], it was held that the mere holding of a session in a room other than the regular court-room did not warrant a conclusion that the trial was secretive or violative of the rights of the defendant. In *People* v. *Buck*, 46 Cal.App.2d 558, at pp. 561-562 [116 P.2d 160], the locking of doors during the giving of instructions to the jury was not violative of public trial, when defendant made no objection thereto at the time. Therein it was said, at page 562, that "The term 'public trial' is used in a relative sense and its meaning depends largely upon the circumstances of each particular case." In *People* v. *Hartman*, 103 Cal. 242 [37 P. 153, 42 Am.St.Rep. 108], judgment was reversed because defendant had been denied a public trial; but in so reversing the court pointed out, at page 244, that the constitutional guarantee did not require the courts to do unreasonable and impossible things, and that the convenience of the court and the due and orderly conduct of trial must be taken into consideration in determining whether or not a public trial had been denied. At page 245 the Hartman opinion also holds that those "things which may facilitate the proper conduct of the trial" do not necessarily constitute a breach of the guarantee of public trial. Under the circumstances we cannot conclude that actions of the trial court herein, holding session in another room for the purpose of hearing that which could not be heard in the regular courtroom, was a denial of public trial. In the absence of any definite showing that the public was excluded, we must presume, in support of the judgment, that no error was committed in this regard (*People* v. *Swafford*, 65 Cal. 223 [3 P. 809]).

The appellant has not attacked the sufficiency of the evidence. We have read the record. The evidence is ample to support the judgment. No other error appears in the record.

The judgment and order appealed from are affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Spence, J., McComb, J., and White, J., concurred.