[Crim. No. 6877. In Bank. Oct. 13, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. BERTRAND JOSEPH HOWK, JR., and MARTIN HOROWITZ, Defendants and Appellants.

Martin N. Pulich, Public Defender, John D. Nunes, Chief Assistant Public Defender, Chris G. Gasparich, Assistant Public Defender, and Gregory S. Stout for Defendants and Appellants.

Stanley Mosk, Attorney General, Arlo E. Smith and Albert W. Harris, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—Bertrand Joseph Howk, Jr., also known as Mohammed Abdullah, and hereafter referred to as Abdullah, and Martin Horowitz, were jointly charged with the murder on July 13, 1960, of Sonja Lillian Hoff. Abdullah pleaded not guilty and not guilty by reason of insanity, but voluntarily withdrew the insanity plea prior to trial. Horowitz pleaded not guilty. The cases were consolidated, and the defendants were jointly tried. The jury found Abdullah guilty of murder of the first degree and found Horowitz guilty of the included offense of involuntary manslaughter. The same jury determined that as to Abdullah the penalty should be death. Abdullah moved for a new trial, or, in the alternative, for a reduction of the penalty. Both motions were denied. Judgments were entered in accordance with the verdicts. Both defendants filed notices of appeal. In addition, the appeal of Abdullah is automatically before this court under the provisions of section 1239, subdivision (b), of the Penal Code. The appeals have been consolidated.

## APPEAL OF ABDULLAH

A. *The guilt phase of the trial.*

On the guilt issue, as to Abdullah, the public defender, the defense counsel, fairly and properly concedes:

"A close reading of the entire transcript of the trial on the issue of guilt leads to no other conclusion but that the Appellant was fairly tried and, accepting the evidence in a light most favorable to the prosecution, properly convicted of murder in the first degree. To the rulings of the trial court and the conduct of the prosecuting attorneys during this

phase of the trial the Appellant takes no exception.'' On the oral argument counsel repeated this concession.'

A reading of the transcript demonstrates the correctness of this concession. The evidence, mainly taken from Abdullah's own testimony at the trial and from his several statements given after his arrest, shows a planned, premeditated and deliberate murder committed by him.

Abdullah grew up in Long Beach. He was raised in the Catholic faith but was converted to the Moslem faith in 1956. In 1958, by court order, he had his name legally changed to Mohammed Abdullah. In the spring semester of 1960 he was a senior student at the University of California at Berkeley. At that time Sonja Hoff was a junior at the university. The two had met in October or November of 1959 as a result of their common interest in their studies. Sonja was not a Moslem but was interested in Islamic history and philosophy. Abdullah and Sonja soon became friends, and Abdullah fell in love with her. He asked her to marry him on several occasions but she refused. Nevertheless, during early 1960 they continued to see each other frequently. The relationship was far from tranquil. The record contains references to many instances when Abdullah threatened to kill Sonja, threatened suicide, or threatened to or did injure others that he thought were unduly attentive to Sonja. Sonja was critical of Abdullah because he smoked, and drank intoxicating liquors, acts which she contended were contrary to the precepts of his religion. Abdullah objected to how Sonja dressed and went to dances, and was extremely jealous of any attentions paid to her by other men. On April 18, 1960, they decided to break off their friendship, but became reconciled on April 20, 1960. After their reconciliation, but on that very day, while crossing the campus, they engaged in a violent argument overheard by a police officer. Abdullah threatened to kill Sonja, and, in a loud voice, called her obscene names. Sonja ran to the officer for help. Abdullah signed a statement admitting the threats, but he said he did not really mean them. On another occasion, early in May of 1960, Sonja, followed or chased by Abdullah, ran to the campus police station for protection and stated that Abdullah had threatened her life. Abdullah admitted that such threats had been made. As a result of this incident Abdullah, under threat of expulsion, withdrew from the university.

Abdullah was violently jealous of anyone he thought was unduly friendly with Sonja. He expressed jealousy and

threats against a Persian student whom he had never met but who, at one time, had been interested in Sonja. On one occasion he threatened, attacked, and cut with a broken bottle, another student who was assisting Sonja in her studies. On several occasions he threatened suicide in Sonja's presence, trying, he said, to scare her into compliance with his wishes. During the spring of 1960 Abdullah stated to at least four persons that he intended to kill Sonja, and in a record book kept by him he noted under date of April 6, 1960, that when he next suspected Sonja of liking another man he would kill her.

During most of June, 1960, Sonja was absent from Berkeley. She returned to Berkeley early in July, and met Abdullah on July 9, 1960. She was friendly towards him, but refused to give him her current address. Abdullah testified that on July 11th he decided to kill the girl. On that date he tried to induce her to go to his apartment where, he testified, he intended to cut her throat or choke her to death and then turn on the gas and commit suicide. Sonja refused to go. On July 13th he again decided to kill her. On that date about noon he saw Sonja at International House and, pursuant to his preconceived plan, asked her to get him a book out of the university library. This she promised to do. He then asked her to meet him in a designated room of the library at 5:30 p.m., and she agreed. He testified that when he made these arrangements he intended to kill Sonja when he met her in the library. He wanted a gun for this purpose. He encountered Horowitz, invited him to his apartment, and secured from him the loaded gun later used by him to commit the murder.[1] He then left the apartment, drank some beer, and purchased some typing paper on which to write a murder and suicide note. At about 5 p.m., he proceeded to the library. There he rented a typewriter and typed out a note in which he declared his intention to kill Sonja and himself. Then he went to the arranged rendezvous with Sonja. She gave him the requested book, and he told her that he loved her and she replied ''I know'' or ''I love you, too.'' He then arose, stood behind her, and, holding the gun within 6 or 8 inches of her head, fired twice, killing her instantly. He then fired a shot into his right temple, inflicting a serious head wound. That night, and

---

[1]The circumstances under which this gun was secured are fully described in the portion of this opinion, *infra*, disposing of the appeal of Horowitz.

several times thereafter, he gave statements to the police giving full details of the killing.

Such evidence, of course, shows both malice and premeditation. It amply supports the finding that such murder was of the first degree. As already pointed out, appellant admits that this is so.

B. *The penalty phase of the trial.*

On the penalty trial the prosecution called Dr. McGaughey, a psychiatrist who had examined defendant in the hospital on July 15th and 16th, shortly after the murder and attempted suicide. Abdullah stated to this witness that he, Abdullah, deserved the death penalty. He told the doctor that he loved Sonja, and, knowing that she would not marry him, had decided to kill her and himself. The witness opined that Abdullah had a personality character disorder and had grandiose ideas; that he had a history of psychoneurotic traits and characteristics; that he had abnormal phobias; that his abstract intelligence was superior; that possibly the self-inflicted bullet wound might have resulted in a crude "prefrontal lobotomy," an operation sometimes performed on the extremely agitated in order to make them less agitated; that this might have resulted in a "flattening" of emotional responses so that he would give the outward impression of apparent indifference and callousness. The doctor found that Abdullah, because of his mental and emotional condition, had some impairment of judgment. The doctor felt that a period of years under institutional routine might change Abdullah's habit pattern.

A Long Beach police officer testified that in December of 1955, when Abdullah was 16, he, the officer, went to Abdullah's home in response to a report about a fire, and discovered some burned areas in the living room. Abdullah told him that he had set the fire because he had promised his mother and himself that he would burn the house, and "I never break a promise"; that he had "promised" to kill his mother "and I intend to do it with either fire, steel or water"; that his mother was "a pig and a woman and women are born without souls, so it really doesn't matter whether I kill her or not, does it?"; that God had given him permission to kill his mother; that he disinfected with alcohol everything his mother touched because she was contaminated; that a woman should not be permitted to correct a male child; that a woman's only function was to bear children, and after they have borne their

children they should be exterminated along with older men; that he disapproved of our form of government and believed in a modified form of Nazism. The witness arrested Abdullah for investigation of arson and as a suspected "psycho." Abdullah was then committed by the juvenile court to Camarillo State Hospital for observation for 90 days, after which he was returned to the juvenile authorities.

Dr. Rapaport, a psychiatrist, found that Abdullah had a behavior disorder, a schizoid personality, and was emotionally immature. Some such persons, according to the doctor, eventually gain maturity and some respond to long institutionalization. He found no evidence of a therapeutic lobotomy, but believed a head wound such as that of Abdullah, could affect the mental and emotional condition of the person involved.

The prosecution then read into the record two entries in Abdullah's diary, admittedly in his handwriting. The earlier entry in point of time stated that Abdullah was having trouble with his eyes and teeth and was tired from being overweight, and was unhappy. It then continued: "I have been in a rage for several years now, and my temper is growing shorter. I frequently feel like brutalizing every infidel with whom I have the misfortune to come into contact. May Allah destroy the enemies of Islam! May Allah make us, his faithful slaves, the instrument with which he anihilates [sic] the enemies of the faith!"

Sometime later he wrote:

"I want to kill. I don't care whom I kill as long as I can kill someone who is an enemy of my God." He expressed the hope that he would meet Sonja the next day because she was gentle and would quiet him. He then stated that men unlike women have a drive, a "need to kill" which is 50 to 100 times stronger than the need to love a woman. "I never have had to close myself up in the house lest I might abuse a woman, but I have had to shut myself away and even be absent from school lest I kill the first person I meet on the street."

The defense produced several witnesses, friends of Abdullah, who testified that, while Abdullah had a temper, they had never seen him violent or utter threats against Sonja. There was evidence that Abdullah was active in the Moslem church in San Francisco, that he gave talks on religious subjects there, and conducted a Sunday school class for small children. Abdullah's mother testified that her son was a bright boy who started to read and write at the age of 3; that he started

school in the second grade and thereafter skipped at least three grades; that he graduated from high school at age 15 and was awarded several scholarships; that he then attended Long Beach City College, and then the university at Berkeley; that Abdullah had been brought up in the Catholic faith and as a child had been active in that church; that from her observations Sonja and her son seemed to be very happy with one another. She denied that Abdullah had threatened her with violence, and that she ever heard him threaten to commit suicide, or that she was frightened of him. Impeaching evidence was offered to the effect that the mother before and after the killing had told various officers that she was in fear of Abdullah, that her son had attempted suicide, and had wild fits of anger.

Another psychiatrist testified that, pursuant to a court order, he had examined Abdullah on three occasions. He opined that Abdullah had a serious mental illness which he described as ''a paranoid schizophrenic state of a chronic variety.'' He explained that ''[t]hese words simply refer to what you might think of as a disorder of thought, so that as a person develops—and this usually comes on in childhood or adolescence, although not always—they have difficulty with their thought processes. Instead of what we would call logical thinking, their thinking is generally illogical, often becoming confused. . . . associated with this would be a disturbance of the emotional state with what you could call inappropriate emotions. For example, something very sad or terrific might occur, and the person would laugh at it, and we would call this an inappropriate emotional state. There would also be evidences of bizarre behavior of one kind or another'' developing into a state of withdrawal and fantasy. He indicated that a schizophrenic might have hallucinations or actual delusions. The doctor also opined that Abdullah's powers of judgment had been affected so that he was unable to function normally in this respect; that under ''stressful situations there would be greater impairment.'' The doctor thought that it was possible that the self-inflicted bullet wound in the head may have cut some of the fibers between the emotional center of the brain and the frontal lobes of the brain, accomplishing a rough operation similar to a lobotomy. If this had occurred it would result in a blunting of the emotions of the person affected; that such an operation reduces homicidal tendencies; that while a long period of restraint would help this mental condition it would not cure it. The doctor however was definitely

of the opinion that Abdullah at the time he examined him was legally sane.

On this evidence the jury imposed the death penalty.

Counsel for Abdullah, as already pointed out, confines his argument to the penalty phase of the trial. It is contended that the court gave the jury no proper instructions on how it should exercise its discretion in selecting the proper penalty. In this connection, it is urged that by instructing the jury that it had unlimited discretion in choosing the penalty, without fixing standards, the court permitted the jury to act arbitrarily. The court should, so it is contended, have given several proffered instructions that purported to fix proper standards. It is also urged that this court possesses the power to reduce the penalty to life imprisonment, and, under the evidence, should do so. These contentions lack merit.

The first contention centers around several instructions offered by Abdullah and refused by the trial court. These instructions are as follows:

"The Court instructs you that if you entertain a reasonable doubt as to which of the two or more punishments should be imposed, it is your duty to impose the lesser.

"In determining which punishment shall be inflicted, you are entirely free to act according to your own judgment.

"If any individual juror, or the jury as a whole, entertains a reasonable doubt as to which one of two or more punishments should be imposed, it is your duty to impose the lesser of the two."

Another instruction was offered to the effect that, while the determination of the penalty "rests entirely in your discretion" the exercise of such discretion should be based on a rational consideration and interpretation of the evidence; that the jury may consider all the facts surrounding the commission of the crime, and the defendant's history and background "which operate in aggravation or mitigation. However, those facts which tend to show aggravation may only be considered by you if you are convinced that such facts have been proved by a preponderance of evidence. If you are not convinced that such facts are proved by a preponderance of evidence then you should not consider them in arriving at your decision as to what is the proper penalty."

Preponderance of the evidence was then defined and then the instruction continued: "Should the conflicting evidence be evenly balanced in your minds, so that you are unable to say that the evidence on either side of the issue preponderates,

then your finding must be against the party carrying the issue.''

An alternative instruction was offered, very similar to the one above, except that it would have applied the reasonable doubt test rather than the preponderance of evidence test.

Instead of these instructions, the trial court instructed that in ''determining which punishment shall be inflicted, you are entirely free to act according to your own judgment and absolute discretion''; that the law prescribes the two alternative penalties but ''provides no standard for the guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed, to the judgment, conscience and discretion of the jury. . . . In this determination you will consider all of the evidence of the circumstances surrounding the crime, of the defendant's background and history, and of the facts in aggravation or mitigation of the penalty which have been presented to you here in court, weighing and considering the evidence under the applicable rules of law which are given to you in the instructions of the Court. . . .

''With respect to the penalty, no burden of proof is cast upon the People or the defendant to show by any particular amount of evidence, which penalty should be imposed by you.

''Beyond prescribing the two alternative penalties, the law itself provides no standard for your guidance in the selection of the punishment.

''The law provides equally the two penalties of death or life imprisonment, but neither penalty attaches automatically or at all until the jury unanimously agree upon their choice of punishment and designate it in their verdict.

''There is no rule of law which suggests that the punishment should be death unless there is evidence or [sic] extenuating or mitigating circumstances, nor does the law suggest that the penalty should be life imprisonment unless there is evidence in aggravation of the offense.'' The court went on to instruct that murder of the first degree is a most serious crime and carries with it as punishment life imprisonment or death; that in determining this question the jury should consider all the evidence including the prior history of the defendant ''but that it is not essential to your choice of either penalty that you find palliating or mitigating circumstances on the one hand or evidence in aggravation of the offense on the other. Insofar as selecting the penalty is concerned, as between the two alternatives, the law does not itself prescribe,

nor authorize the Court to innovate, any rule circumscribing the exercise of your discretion, but, rather, commits the whole matter of its exercise to the judgment and consciences of the jury.''

That the proffered instructions were correctly refused because they incorrectly state the law is now settled. In the recent case of *People* v. *Purvis, ante,* p. 93 [13 Cal.Rptr. 801, 362 P.2d 713], substantially similar instructions were requested and refused. In holding that these instructions did not correctly state the law this court declared (p. 95):

''Defendant requested the trial court to instruct the jury that in exercising its discretion as to the appropriate penalty it was to consider only facts proved beyond a reasonable doubt. He requested an alternative instruction that only facts established by a preponderance of the evidence could be considered. He also requested the court to instruct the jury that if it entertained a reasonable doubt as to which of the penalties to impose, the lesser penalty should be given.

''The court properly refused to give the requested instructions. The jury has absolute discretion in fixing the penalty and is not required to prefer one penalty over another. (*People* v. *Jones,* 52 Cal.2d 636, 648-649 [343 P.2d 577]; *People* v. *Brice,* 49 Cal.2d 434, 437 [317 P.2d 961].) In evaluating the evidence the jury was bound by the instructions given as to the limited purpose for which certain evidence was admitted, but beyond that it could draw its own inferences, determine the probative weight of evidence, and select the appropriate penalty on the basis of its evaluation of the evidence. (*People* v. *Brust,* 47 Cal.2d 776, 787-790 [306 P.2d 480]; *People* v. *Friend,* 47 Cal.2d 749, 767-768 [306 P.2d 463].)''

Counsel for Abdullah argues that the *Purvis* case, and the cases upon which it relies, were wrongly decided. We believe that the *Purvis* case correctly states the law. On the authority of that case we hold that the point here involved is without merit.

The other major contention, namely that, under the facts, the death penalty was unwarranted, and that this court has the power and the legal duty to reduce the penalty to life imprisonment, is also without merit. This court has been importuned on many occasions to exercise such a power. Uniformly, the request has been rejected. Less than a year ago, in October of 1960 in the case of *People* v. *Rittger,* 54 Cal.2d 720 [355 P.2d 645], the question was reconsidered, and most of the arguments now made by Abdullah found to

be without merit. In that case Mr. Justice Schauer, speaking for a unanimous court, had the following to stay on the subject (pp. 734-735):

''No error contributed to the choice of penalty; defendant's appeal in this regard, like his argument in the trial court, is addressed to the suitability, not the correctness, of the punishment. The burden of his argument is that he is in effect a victim of the institutions where he was confined over the years, where his problems were repeatedly recognized in official reports, but where he was never given professional aid or treatment directed to the solution of those problems.

''We have consistently and repeatedly taken the view that 'The trier of fact has sole responsibility and absolute discretion to select the penalty for first degree murder. [Citations.] This court cannot substitute its judgment as to choice of punishment [citation] even where we may doubt the appropriateness of the death penalty [citations].' (*People* v. *Linden* (1959), 52 Cal.2d 1, 26 [28-29] [338 P.2d 397]; accord, *People* v. *Cash* (1959), 52 Cal.2d 841, 845 [1] [345 P.2d 462].) Only the trial court has power to reduce the punishment originally selected by the trier of fact (*People* v. *Moore* (1960), 53 Cal.2d 451, 454 [2] [2 Cal.Rptr. 6, 348 P.2d 584]) and in this case it advisedly refused to exercise such power. We adhere to the view of the foregoing cases and the decisions cited therein. *People* v. *Jackson* (1955), 44 Cal.2d 511, 517 [1], 521 [282 P.2d 898], relied on by defendant as asserting the power of this court to reduce the death penalty, does not stand for so broad a proposition. This court's reversal of judgments sentencing the defendants there, respectively, to death and life imprisonment without possibility of parole, with directions to sentence them to life imprisonment, was designed to correct punishments which as a matter of law were too severe; that is, the evidence showed only kidnaping for ransom without bodily harm, whereas the more severe punishments were statutorily authorized (Pen. Code, § 209) only where the victim suffered bodily harm; furthermore, elements of unfairness in the trial judge's conduct of the case contributed to the jury's determination that defendants were guilty of the more serious offense. Here, on the other hand, defendant was fairly tried, properly convicted, and the selection of the death penalty was within the discretion of the trial court.''

These conclusions are in accord with a long line of earlier decisions (*People* v. *Cash*, 52 Cal.2d 841, 845 [345 P.2d 462];

*People* v. *Linden,* 52 Cal.2d 1, 26 [338 P.2d 397]; *People* v. *Green,* 47 Cal.2d 209, 235 [302 P.2d 307]; *People* v. *Carmen,* 43 Cal.2d 342, 351 [273 P.2d 521]; *People* v. *Harrison,* 41 Cal. 2d 216, 219 [258 P.2d 1016]; *People* v. *Dessauer,* 38 Cal.2d 547, 555 [241 P.2d 238]; *People* v. *Thomas,* 37 Cal.2d 74, 77 [230 P.2d 351]; *People* v. *Odle,* 37 Cal.2d 52, 58 [230 P.2d 345]; *People* v. *Danielly,* 33 Cal.2d 362, 383 [202 P.2d 18]; *People* v. *Tuthill,* 32 Cal.2d 819, 827 [198 P.2d 505]).

Abdullah argues, however, that this court was wrong in all of these cases and should now reverse itself. We think that those cases were correctly decided. For that reason, the point under consideration is without merit.

On both phases of the trial the case was fairly tried. The finding of the jury that the murder was of the first degree is obviously supported. The fixing of the penalty was within the discretion of the jury. The case was ably presented by both sides. The record is remarkably free of even minor errors. Certainly, no prejudicial error appears. This being so, as to Abdullah, the judgment and orders appealed from should be affirmed.

### Appeal by Horowitz

#### Facts

Horowitz was convicted of involuntary manslaughter, an offense included within the charge of murder. So far as pertinent here, involuntary manslaughter is defined by section 192 of the Penal Code as:

"Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: . . . .

"2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; . . ."

The evidence against Horowitz consists of the testimony of Abdullah, statements given by Horowitz voluntarily on the day of the murder or shortly thereafter, and of the testimony of several witnesses, some of whom were friends or acquaintances of Abdullah, or of Horowitz, or of both. Horowitz did not testify on his own behalf.

Abdullah testified, as a witness in his own defense, that he had met Horowitz two or three months before July 13, 1960, and had seen him less than ten times before that date; that he knew Horowitz possessed some guns; that about eight days before July 13, 1960, he had a conversation with Horowitz

and told him that he wanted to kill Sonja and needed a gun; that Horowitz stated to him that the best way to murder was to make it look like a hunting accident; that he would furnish a gun; that the two went to Horowitz's quarters and Horowitz gave him a gun; that he examined it and gave it back to Horowitz stating that he did not have the "guts" to use it; that on July 13, 1960, shortly after noon, he saw Horowitz going into a restaurant and followed him; that Horowitz told him that he had recently been dispossessed of his apartment; that he invited Horowitz to bring his suitcase and brief case to his apartment; that the two men proceeded to Abdullah's apartment; that he told Horowitz he wanted a gun to "protect" himself; that Horowitz said he might as well sell a gun to him; that he paid Horowitz $20 for the gun and promised to pay him an additional $20 later; that Horowitz delivered the gun to him, and told him that it was loaded; that he put the gun in his pocket while Horowitz was out of the room; that the two proceeded back to the restaurant and had some beer and then parted; that it was true that in his suicide note and in several statements to the police he had stated that he had stolen the gun from Horowitz but this was not true; that he had made such statements to protect Horowitz.

Several students who knew both Abdullah and Horowitz testified that they had heard Abdullah make threats about killing Sonja, and also knew Horowitz and knew that he possessed guns. One of them, Pieper by name, testified that about a week before July 13, 1960, he sought out Horowitz and expressed to him his concern about Abdullah's mental condition; that he warned Horowitz about giving Abdullah a gun; that Horowitz replied that if any of his friends needed anything he would give it to them. During the succeeding week this witness saw Abdullah, who again threatened to kill Sonja and stated that he needed and wanted a gun. On July 12th this witness observed Abdullah and Horowitz speaking privately, then leave the restaurant and then return; that he asked Horowitz if Abdullah now had the gun and Horowitz said no.

After the murder, Pieper and a friend saw Horowitz three times during the evening. Horowitz was obviously upset and nervous, and his answers to their questions were somewhat incoherent. On one occasion Horowitz expressed pride in Abdullah because he had "hit the target." In answer to repeated questions as to whether he had given Abdullah a gun, he replied that if it was a .38 "it is mine."

On the night of the murder Horowitz voluntarily reported to the campus police, and that night, and the next day, wrote out several statements, both prior and subsequent to his arrest. He was undoubtedly emotionally disturbed when he came to the police department, and many of his statements and replies were incoherent. But some of them made sense. He told the police that possibly the gun used in the shooting was his, and that he knew of at least four witnesses who had heard Abdullah threaten to ''destroy'' Sonja. Later he admitted the death weapon was in fact his gun, and the police records showed it was owned and registered to him. He then stated that several days before the killing Abdullah had been at his apartment and made various threats; that he had then given Abdullah a gun; that Abdullah had returned the gun to him saying he did not have the courage to use it; that because of this test he was sure in his own mind that Abdullah would not use a gun; that on July 11th, at Abdullah's request, he gave him a gun; that although on the prior occasion Abdullah had said he intended to kill Sonja, Horowitz did not believe that he had the courage to so use it; that he was ''practicing psychology'' on him but apparently, said Horowitz, he had ''fell a little short in some respects.'' Horowitz admitted that on July 13th he was staying at Abdullah's apartment, and that his suitcase and brief case, in which he carried his guns, were there. He first stated that he had seen Abdullah on the afternoon of the murder and then stated that it was the day before.

On July 14th Horowitz was interviewed in jail by a newspaper reporter. The reporter testified that most of the statements of Horowitz were pretty rambling but that Horowitz did state that sometime before July 13th he had given Abdullah a gun and Abdullah had returned it to him. He later gave him a gun the second time believing that Abdullah would not use it, and would return it to him.

On this evidence Horowitz was convicted of involuntary manslaughter as defined in section 192 of the Penal Code. The jury was fully and fairly instructed on the elements of this offense and no complaint is raised on appeal in this respect. ■ Under the section, criminal negligence can amount to lack of ''due caution and circumspection'' sufficient to constitute involuntary homicide within the meaning of the section (*People* v. *Penny,* 44 Cal.2d 861, 871-880 [285 P.2d 926]).

■ Certainly, the evidence of Abdullah, if believed by the jury, was sufficient to show the required criminal negli-

gence, and this is conceded by Horowitz. This concession is in accord with the facts. Abdullah testified that Horowitz sold him the gun on the day of the killing; that this gun was used by him to kill Sonja and to attempt suicide; that about eight days prior to the killing he told Horowitz he wanted to kill Sonja and commit suicide; that in response to his request Horowitz gave him a gun but he returned it because he then did not have the courage to commit the acts. It was a possible and reasonable inference that Horowitz knew when he sold or gave the gun to Abdullah on the day of the killing, or shortly before, that Abdullah wanted it to kill Sonja.

█ Horowitz, while recognizing that Abdullah so testified at the trial, calls attention to the fact that, in his suicide note and in several statements given to the police shortly after the killing, Abdullah had stated that he had stolen the gun from Horowitz. Abdullah at the trial explained that he had so stated because he wanted to protect Horowitz. These extra-judicial statements of Abdullah were properly admitted for impeachment purposes. They merely went to Abdullah's credibility which, of course, was for the jury.

The main point urged by Horowitz as to the testimony of Abdullah is that Abdullah was an accomplice and that his testimony was not sufficiently corroborated. It should be pointed out that the jury was properly instructed that Abdullah was an accomplice with respect to the charge against Horowitz, and that his testimony must be corroborated.

█ There is ample corroboration of Abdullah's testimony. The statements given by Horowitz to the police immediately before and after his arrest, and his statement to the newspaper reporter, constitute ample corroboration. Horowitz claims, however, that such statements were not sufficient for reasons hereafter stated.

█ It should be noted that under section 1111 of the Penal Code such corroboration need only tend to connect the defendant with the commission of the crime. As was said in *People* v. *Wade*, 53 Cal.2d 322, 329 [348 P.2d 116]:

"The only corroboration necessary . . . is that which tends to connect the defendant with the commission of the crime, not evidence of the corpus delicti. [Citing cases.] █ The corroborative evidence may be slight and entitled to little consideration when standing alone. [Citing case.] Defendant's own admissions are sufficient corroboration. [Citing case.] Finally, corroborative evidence may be circumstantial. [Citing case.]"

In addition to the admissions of Horowitz, there was some other corroboration. Admittedly the gun used by Abdullah was owned by and registered to Horowitz. A suitcase and brief case belonging to Horowitz were found, after the murder, in Abdullah's apartment. Horowitz was known, at least to one witness, to have carried guns in the brief case. The witness Donald Pieper had warned Horowitz, about a week prior to the murder, that Abdullah was mentally upset, and that in his opinion Horowitz should not give a gun to Abdullah.

When this testimony is considered with the admissions of Horowitz, the corroboration is more than sufficient. Horowitz admitted on the very night of the murder that the gun used was his. He admitted that he brought the gun to Abdullah's apartment and gave it to him, loaded. He admitted that he knew that Abdullah was emotionally upset and that Abdullah had threatened to kill Sonja and himself; that he was practicing psychology on Abdullah when he gave him the gun; that he gave the gun loaded because he felt it would not be used. This constitutes almost overwhelming corroboration.

Horowitz contends, however, that his admissions cannot be considered because, so he claims, the record demonstrates that they were the product of a diseased and deranged mind. Horowitz did produce a psychiatrist who testified that in his opinion the statements given by Horowitz were given in the middle of a "psychopathic episode." But, as opposed to this testimony, a police officer who had known Horowitz for some time testified that when he gave the statements Horowitz appeared alert and normal mentally. Obviously, this conflict was for the jury. (*People* v. *Lehew*, 209 Cal. 336, 342 [287 P. 337]; *People* v. *Rucker*, 11 Cal.App.2d 609, 612 [54 P.2d 508]; *People* v. *Duncan*, 72 Cal.App.2d 247, 252 [164 P.2d 313].) Moreover, many of the statements of fact contained in the statements were corroborated by other testimony, which demonstrates that they properly stated the facts.

Horowitz next contends that his admissions cannot be considered for corroborative purposes, because such admissions were introduced before there was proof of the corpus delicti. It is, of course, elementary that admissions cannot be introduced until proof of the corpus delicti has been made (*People* v. *Rupp*, 41 Cal.2d 371 [260 P.2d 1]). Appellant concedes that where one person is charged with murder his connection with the crime need not be proved as part of the corpus delicti, but claims that if two are charged,

as conspirators or otherwise, proof of the corpus delicti must include evidence of the particular defendant's connection with the crime or at least multiple participation must be shown. There is no merit to these contentions. In a murder case "the corpus delicti consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. [Citing cases.]" (*People* v. *Amaya,* 40 Cal.2d 70, 75 [251 P.2d 324].) It is not necessary to prove the identity of the perpetrator as part of the corpus delicti (*People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1]), nor is it necessary to prove as part of the corpus delicti, when two or more are charged with the offense, that there was multiple participation.

 In the present case the evidence showed that Sonja died from a bullet wound in the back of her head fired by a gun owned by Horowitz, and Abdullah was observed inflicting the wound. This proved the corpus delicti not only as against Abdullah but as against any other principal. The claim that where the prosecution charges multiple parties of the offense there must be a prima facie showing of the connection of the particular defendant to the crime before his admissions can be introduced is illogical and unsound. Obviously, if, where one person is charged, it is not necessary to prove that person's connection with the crime as part of the corpus delicti, no possible reason can exist why such proof is necessary where two or more persons are charged. The cases cited do not support such an illogical rule, and it is not and should not be, the law.

 Appellant's last contention is that error was committed in failing to give the following instruction:

"The guilt of a defendant in a criminal action cannot lawfully be established solely by evidence of a confession, or of an admission, or by both, made by him on an occasion or occasions other than this trial.

"Unless from evidence independent of [any] such alleged confessions and [or] admissions, you can and do find that the crime charged to the defendant was committed by someone, you shall not consider for any purpose any evidence of such a confession or admission. That additional evidence, however, need not independently prove, or include proof of, the identity of the person by whom the offense was committed." (CALJIC 29-C.)

"The guilt of a defendant may not be established alone by

any confession or admission made by him outside of this trial. Before any person may be convicted of a criminal offense, there must be proof, independent of any such statement, that the crime in question was committed, but it is not necessary that such independent proof include proof as to identity of the person by whom such offense was committed." (CALJIC 29-C Alt.)

While no request for such instruction was made, this court has held that it is error to fail to give such an instruction even without request (*People* v. *Holbrook,* 45 Cal.2d 228, 234 [288 P.2d 1]). Thus, it was error here not to give the instruction. But, just as was held in *Holbrook,* the error was not prejudicial, because the evidence, independently of the confessions or admissions, establishes Horowitz's guilt.

On the appeal of Abdullah the judgment and orders appealed from are affirmed. On the appeal of Horowitz the judgment is affirmed.

Gibson, C. J., Traynor, J., White, J., and Dooling, J., concurred.

SCHAUER, J.—I concur in the judgment and in the opinion supporting it, subject to this limitation as to its approval of *People* v. *Purvis* (1961), *ante,* p. 93 [13 Cal.Rptr. 801, 362 P.2d 713]: For the reasons and to the ends explained in my concurring and dissenting opinion in the Purvis case (see *ante,* p. 99). I do not agree that the majority opinion in that case provides adequately accurate or helpful guidance to trial courts in conducting the penalty phase of a capital case.

Whether we like it or not the Legislature of this state has provided for a separate trial as to the penalty in capital cases. We cannot say that such trial shall not embrace the reception of evidence. If evidence is received it should be material to the issue, and its weight as tending to establish ultimate material facts may be argued. And since the only issue then being tried is the selection of penalty, surely the persuasiveness of those facts as they may affect the process of exercising absolute discretion in the selection of the penalty must be arguable.

As indicated in the above mentioned concurring and dissenting opinion in *Purvis* I think this court should more adequately define (for the guidance of court and counsel as to burdens of proof and persuasion, and for instructing the

jury, at the penalty phase of capital cases) the difference between the burdens of (a) proof and (b) persuasion in, respectively, (1) the process of evaluating conflicting evidence to determine whether the existence of particular facts has been proved and (2) the process of exercising absolute discretion in ultimately selecting the penalty.

McComb, J., concurred.