[Crim. No. 11510. In Bank. June 26, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. LISKIE T. MABRY, Defendant and Appellant.

Dennis L. Woodman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edsel W. Haws and Daniel J. Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

BURKE, J.—In 1967 defendant was indicted for the 1954 murder of Police Officer Francis Rea. A jury found him guilty of first degree murder and fixed the penalty at death. Motions for a new trial and for reduction of the penalty were denied, and defendant's automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant contends (1) the court erred in refusing to give instructions on manslaughter and second degree murder and committed other error in instructing the jury; (2) certain evidence was improperly admitted; (3) defendant had ineffective representation by counsel at the trial; (4) the death penalty as applied is unconstitutional; and (5) the court improperly excluded for cause certain veniremen. We have concluded that none of the contentions can be upheld and that the judgment should be affirmed.

Shortly after 8 p.m. on January 2, 1954, Police Officers Dean Jones and Joe Marvelli received a radio call regarding a burglary at the Acme Warehouse in North Sacramento and proceeded there. About the same time the decedent Francis Rea, and his partner, Percy Gassaway, also received a call directing them to the same warehouse. When Rea and Gassaway turned onto Douglas Avenue one block east of the warehouse, Gassaway saw a man carrying a container or suitcase running from the west across the intersection of Douglas Ave-

nue and an alley that was adjacent to the warehouse. Gassaway turned into the alley, and Rea directed his attention to a man fleeing about a half block-south of where Gassaway last observed the suspect. Rea left the car and pursued the man on foot. Gassaway drove through the alley and next saw the suspect over a block further south at the intersection of Douglas Avenue and El Monte Avenue. He radioed the other police car for assistance, the suspect fired at him and returned around the corner, and Gassaway then heard more shots.

Officers Jones and Marvelli, who responded to Gassaway's call, found Rea lying unconscious near where Gassaway last saw the suspect. The following day Rea died. According to the autopsy surgeon, the cause of death was a gunshot wound that penetrated the head, and the lethal bullet probably was of .22 caliber.

The morning after the shooting a .22 caliber gun was found in the yard of a house at the intersection of Douglas Avenue and El Monte Avenue, and a pry bar was discovered a short distance farther north in the area of the path where the suspect had fled. There was circumstantial evidence that the pry bar was used to gain entrance to the Acme Warehouse and also to Livingston Cement Company and the Bowman residence, both of which were in the immediate vicinity of the Acme Warehouse. A bottle of whiskey was missing from the Livingston Cement Company, and in the Bowman residence the police discovered a similar bottle, which had not been there when the Bowmans left. Jewelry taken from the Bowman residence was discovered at a location between the places the pry bar and gun were found. Other jewelry belonging to the Bowmans was discovered in a corporation yard east of the Acme Warehouse.

On the date of the crime defendant lived in Sacramento with a woman, her son Steven Colvin, and her daughter Jerry. They left Sacramento two days after the shooting. At the time of the trial the woman was named Mrs. Jean Hodges, and the daughter had become Mrs. Jerry Long.

In March 1967, over 13 years after the crime, Mrs. Hodges contacted the district attorney and gave a report concerning the crime that implicated defendant.

At the trial Mrs. Hodges testified as follows: On January 2, 1954, defendant told her he was going some place to try to get some money or to commit a burglary and also mentioned selling some guns, and she agreed to go with him. They drove a ways and then parked. [The location she pointed out to

officers as the place they parked was near Douglas Avenue in the immediate vicinity of where Gassaway saw the suspect fleeing.] Defendant took with him a pry bar that looked like the one found by the police. She lay down in the car but sat up when she heard something about 45 minutes or an hour after defendant left the car. She then saw defendant running crouched down and a policeman with a shotgun pursuing him. The policeman shot the gun, she thinks she heard more shots, and she then left. The next morning defendant came home and told her "he shot a policeman." He also told her he had been in a residence and in a warehouse.

Mrs. Jerry Long testified that before defendant left home on the night the policeman was shot she heard him tell her mother "to drive away if there was any trouble" and that after defendant came home the next day she heard him say that "he had shot a policeman." And Colvin testified that after they left Sacramento he overheard defendant make various threats such as that if Mrs. Hodges said anything about what happened he would "take care of all of us."

Colvin aided the police in obtaining a tape recording of a conversation between him and defendant, the admissibility of which is discussed later herein. In the conversation Colvin told defendant that he had heard a rumor about defendant and "[s]omething about killing a policeman" and Colvin asked defendant ". . . Is this about that up in Sacramento?" Defendant replied that he did not know. Thereafter during the conversation defendant made various admissions. For example, he stated, ". . . You just never lived in Sacramento . . . it's been what, this is '67, '54, that's thirteen years . . . you was only a kid then, see." He also told Colvin to find out from Mrs. Hodges if she told her present husband "about Sacramento, and no matter what she told him she better straighten it out . . . because if I go she's going. She'll sniff the pill with me." He further stated that Mrs. Hodges is "just as guilty as I am. She was driving the car that night and . . . she had a gun . . . in the . . . seat of the car. I'm the one that came and got her out, I got her away from there. I told her, if anything happens, split. I got away. If she'd have set [sic] there she'd have been in jail. . . . We'd have both been in jail for that matter. . . ."

Defendant, who did not testify at the trial, introduced evidence of bias against him on the part of Mrs. Hodges and her daughter and son. He also presented proof that several of the matters Mrs. Hodges testified to regarding the crime had been

reported in newspapers, and he showed some inconsistencies in. her accounts, such as the place where she had been parked on the night of the crime.

The parties stipulated that evidence admitted at the guilt trial might be considered by the jury at the penalty trial. In addition at the penalty trial the prosecution introduced proof that defendant was received in prison in 1936 for car theft and. first degree robbery, was paroled in 1940 but was returned to prison later that year for first degree robbery, was paroled in 1944 but was returned to prison in 1947 for first degree robbery, escaped in 1949 but was returned to prison later that year with an additional prison commitment for escape, was paroled in 1952 but was returned to prison in April 1954 for forgery, was paroled in 1958 but was returned to prison in 1960 for receiving stolen property, escaped in 1961 but was returned to prison in 1962, and was paroled in 1965.

A parole agent, called as a defense witness, testified that defendant was under his supervision from the fall of 1965 to February 1967 and that all his reports regarding defendant were satisfactory. A businessman, also called as a defense witness, testified that defendant worked for him from January 1966 through March 1967 and that he considered defendant an industrious and honest employee. The defense also introduced other evidence, such as testimony by Mrs. Hodges, that before defendant's 1961 escape she told him that the family was destitute and that while at large he contributed to the family's support.

### Asserted Errors in Instructions

The jury was instructed in part that in order to convict defendant of first degree murder they must find that defendant killed Rea while in the commission of a burglary and that if they find that defendant did not commit or attempt to commit a burglary on the night in question they must acquit him. The court refused to give instructions requested by defendant on second degree murder and manslaughter, and defendant claims that the court thereby erred.

It is the duty of the court to instruct on every theory of the case finding support in the evidence. (*People* v. *Modesto,* 59 Cal.2d 722, 727-730 [31 Cal.Rptr. 225, 382 P.2d 33] ; *People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281] ; see *People* v. *Lessard,* 58 Cal.2d 447, 452 [25 Cal.Rptr. 78, 375 P.2d 46].) Here the theory defendant advanced in

the trial court in support of the requested instructions was that there "is evidence [from] which it can be inferred . . . that the burglar was not the killer" and presumably evidence that the killing was a lesser included offense. However, the evidence defendant pointed to clearly did not tend to show that the burglar was not the killer.[1] On appeal defendant points solely to Mrs. Dorothy Bowman's testimony that "Somebody had been staying there [i.e. in her kitchen or house] and had been using the pots and pans and dishes" and to testimony by N. J. Jensen, who lived in the neighborhood of the crime, that he told the police that an intruder he encountered in his yard shortly after the shooting "looked like a Mexican." The Attorney General, however, correctly states that this evidence has no tendency to show that the burglar was not the killer, that "[a]t best, it is wholly neutral on that issue and may be said to show that the killer was a Mexican who stayed some time at the Bowman residence— and therefore indicating that [defendant] who was in the area for no more than an hour, is entirely innocent."

■ Where the evidence points indisputably to a homicide in the perpetration of, or attempt to perpetrate, a burglary or one of the other felonies enumerated in Penal Code section 189 it is proper for the court to advise the jury that the defendant either is innocent or is guilty of murder in the first degree. (*People* v. *Turville*, 51 Cal.2d 620, 633 [335 P.2d 678]; *People* v. *Riser*, 47 Cal.2d 566, 581 [305 P.2d 1]; *People* v. *Rupp*, 41 Cal.2d 371, 382 [260 P.2d 1]; *People* v. *Sanford*, 33 Cal.2d 590, 595 [203 P.2d 534]; *People* v. *Perkins*, 8 Cal.2d 502, 516 [66 P.2d 631].) The instant case comes within that rule.

■ There is no merit to defendant's contention that the court committed prejudicial error in giving two sets of instructions at the guilt trial and thereby assertedly confus-

---

[1]Defendant pointed to the following evidence: An encounter by N. J. Jensen, who lived in the neighborhood of the crime, with an intruder in his yard, which is east of Douglas Avenue, shortly after the crime; the discovery of loot from the Bowman residence in the corporation yard, which is west of Douglas Avenue; the discovery of other loot from the Bowman residence and the pry bar north of Bassetlaw South and finding the gun south of Bassetlaw South; the absence of loot south of Bassetlaw South; and Mrs. Bowman's description of her house as in chaos and testimony that "Somebody had been staying there and had been using the pots and pans and dishes." Defendant argued that this evidence showed that the burglar ran south along Douglas Avenue and turned west toward the corporation yard before reaching Bassetlaw South, while the killer, entering the area from the south, shot Rea south of Bassetlaw South, then fled northeast where he encountered Jensen.

ing the jury. At the guilt trial the court, after giving instructions, recalled the jury and stated that the jury had been erroneously instructed, that the court would again give instructions and that the jury should follow the instructions that would be given and disregard the prior ones. The instructions thereafter given were substantially the same as the prior ones except that the court omitted an instruction defining premeditation and deliberation and gave certain additional instructions.[2] The court thereafter again recalled the jury and made it even clearer that premeditation and deliberation were not matters for the jury's consideration, that in order to convict defendant of first degree murder the jury must find that he committed the killing while committing or attempting to commit a burglary, and that if the jury does not so find they must acquit him. From the foregoing it is apparent that defendant was not harmed by the jury's having heard more than one set of instructions.

### Asserted Error in Admission of Evidence

Defendant contends that it was error to admit Mrs. Hodges' testimony that he told her he shot a policeman because the receipt of the testimony assertedly violated the privilege for confidential marital communications (Evid. Code, § 980). However, no objection on that ground was made at the trial, and defendant may not now claim for the first time that the admission of the testimony violated that privilege. (Evid. Code, § 912, subd. (a); *People* v. *Kroeger*, 61 Cal.2d 236, 246 [37 Cal.Rptr. 593, 390 P.2d 369].) Furthermore, even had a timely objection been made, Mrs. Hodges' testimony would have been admissible because her uncontradicted testimony shows that she married defendant before a divorce she was obtaining from her husband became final and that her marriage to defendant was void and later annulled.

Since the marriage of defendant and Mrs. Hodges was illegal and void (see Civ. Code, § 61), the confidential marital communications privilege was inapplicable. (*People* v. *Keller*, 165 Cal.App.2d 419, 423-424 [332 P.2d 174]; *People* v. *Glab*, 13 Cal.App.2d 528, 535 [57 P.2d 588]; see 8 Wigmore on Evidence (1961) § 2335, pp. 647-648; 97 C.J.S., Witnesses, § 267, pp. 765-766.) As Wigmore explains, ''In such cases the

---

[2]The additional instructions concerned the meaning of ''in the perpetration of a burglary'' and expressly informed the jury that the evidence is such that defendant is either innocent of the charge or is guilty of first degree murder.

policy of the privilege does not apply . . . since the relation is not one in which the law wishes to foster confidence. . . ." (See 8 Wigmore on Evidence, *supra*, § 2335, p. 647.) In *People* v. *Godines,* 17 Cal.App.2d 721, 727 [62 P.2d 787], it was held that a confidential marital communication before an annulment was privileged, but there the marriage apparently was voidable rather than illegal and void.

█ The tape-recorded conversation between defendant and Colvin was admitted over an objection based on *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and defendant contends that the court thereby erred. We do not agree. *Miranda* prohibits use by the prosecution of "statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination" (384 U.S. at p. 444 [16 L.Ed.2d at p. 706]), and *Escobedo* similarly is concerned with statements elicited by the police during interrogation where, among other things, the suspect is in custody (*People* v. *Ing,* 65 Cal.2d 603, 613 [55 Cal.Rptr. 902, 422 P.2d 590]; *Ballard* v. *Superior Court,* 64 Cal.2d 159, 170 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]). *Miranda* states (at p. 444 [16 L.Ed.2d at p. 706]) that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Under the majority opinion in *People* v. *Arnold,* 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515], "custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived."

Here it appears that defendant was not in custody, as thus defined, at the time of the tape-recorded conversation. The conversation, which was of about 45 minutes duration, occurred in defendant's car, which was parked in front of his house. The police, who several weeks earlier had received information from Mrs. Hodges and her children implicating defendant in the murder, had told Colvin they would like him to obtain a confession from defendant and had attached an electronic device to Colvin's person. That device transmitted Colvin's conversation with defendant to a nearby vehicle, where it was recorded by Officer Burt. Officer Jernigan was in a second nearby vehicle. After the conversation Jernigan

picked up Colvin about a block from defendant's home, and they drove several miles to the airport where they met Burt. Burt played the recording to Jernigan, two other officers, and Colvin. Shortly thereafter defendant was arrested for the murder and later was indicted for that crime.

Defendant further urges on appeal, as he did in the trial court, that the tape-recorded conversation was inadmissible under *Massiah* v. *United States,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. *Massiah* held (at p. 206 [12 L.Ed.2d at p. 250]) that the defendant was denied his right to counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." Here, however, the conversation preceded defendant's indictment. There is no merit to his argument that, since the police had probable cause to arrest him and charge him with the murder at the time of the conversation, he was the "same as under indictment." (Cf. *Hoffa* v. *United States,* 385 U.S. 293, 309-310 [17 L.Ed.2d 374, 386-387, 87 S.Ct. 408].)

Defendant further contends on appeal that the tape recording was inadmissible because recording the conversation violated his rights under the Fourth Amendment to be secure against unreasonable searches and seizures. A specific objection on that ground was not made at the trial,[3] and defendant has shown no special circumstances that would justify our departure from the ordinary rule that errors not challenged at trial cannot serve as grounds for reversal on appeal. (*People* v. *Robinson,* 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].) Furthermore, as we shall see, even had a timely objec-

---

[3]At the trial defendant, in objecting to the receipt of the tape recording, pointed to evidence that the police knew that the sheriff's office had received a call from an attorney who inquired whether there were any warrants for defendant and stated that defendant would give himself up if he was wanted. Defendant stated that the police, with that knowledge, "secretly contrived to take a statement from [him] out of the presence of his attorney" at a time when they "had sufficient evidence to make an arrest and to return an indictment . . . ." Defendant asserted that to elicit a statement from defendant under such circumstances is violative of *Massiah, Escobedo* and *Miranda.* Although in *Massiah* v. *United States, supra,* 377 U.S. 201, it was contended that the use by a government agent of radio equipment to overhear a conversation violated the defendant's Fourth Amendment rights, the United States Supreme Court did not reach that issue, and here it is apparent that defendant relied upon *Massiah* solely for its holding with respect to the right to counsel under the Sixth Amendment. *Miranda* v. *Arizona, supra,* 384 U.S. 436, and *Escobedo* v. *Illinois, supra,* 378 U.S. 478, were based on the Fifth and Sixth Amendments—not the Fourth Amendment.

tion on that ground been made the tape recording would have been admissible.

In *Hoffa* v. *United States, supra,* 385 U.S. 293, 302 [17 L.Ed.2d at p. 382], the Supreme Court stated, "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. Indeed, the Court unanimously rejected that very contention less than four years ago in *Lopez* v. *United States,* 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381]." Accordingly testimony by Colvin concerning the conversation did not violate defendant's rights under the Fourth Amendment (cf. *Hoffa* v. *United States, supra,* at pp. 300-303 [17 L.Ed.2d at pp. 381-382]), made applicable to the states by the Fourteenth Amendment (*Mapp* v. *Ohio,* 367 U.S. 643, 655-657 [6 L.Ed.2d 1081, 1090-1091, 81 S.Ct. 1684, 84 A.L.R.2d 933]).

Nor did the receipt of the tape recording violate those rights. (Cf. *Lopez* v. *United States, supra,* 373 U.S. 427; *Dancy* v. *United States,* 390 F.2d 370, 371; *United States* v. *Knohl,* 379 F.2d 427, 443 [cert. den. 389 U.S. 973 [19 L.Ed.2d 465, 88 S.Ct. 472]]; *United States* ex rel. *Molinas* v. *Mancusi,* 370 F.2d 601, 602-603 [cert. den. 386 U.S. 984 [18 L.Ed.2d 232, 87 S.Ct. 1285]]; *People* v. *Ragen,* 262 Cal.App.2d 392, 397-398 [68 Cal.Rptr. 700] [cert. den. 393 U.S. 1000 [21 L.Ed.2d 465, 89 S.Ct. 489]].) Here, as in *Lopez, supra* (at p. 439 [10 L.Ed.2d at p. 470]), "The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which" one of the participants was working for, or cooperating with, the government and which that participant was fully entitled to disclose. *Lopez* further stated (at p. 439 [10 L.Ed.2d at p. 471]), "We think the risk that petitioner took in offering a bribe to [the government agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." This principle is also applicable here.

Defendant's reliance upon *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], is misplaced. "*Katz* is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance conducted after December 18, 1967" (*Desist* v. *United States,* 394 U.S. 244 [22 L.Ed.2d 248, 258, 89 S.Ct. 1030]), and here the tape recording was made before that date.

## Asserted Ineffective Aid of Counsel

 In support of his claim that he had ineffective aid of counsel in the trial court, defendant first complains of an asserted lack of adequate consultation with the public defender who represented him during most of the trial.[4] Defendant made the same complaint in the trial court and during several discussions regarding the complaint indicated that the public defender talked to him for only about an hour before trial and that had there been additional consultation the public defender would have been aware of facts which would have extended the cross-examination of prosecution witnesses and which might have necessitated calling additional defense witnesses. The public defender stated that he saw defendant at least three times before trial and was furnished with reports by his investigator who spent many hours with defendant before trial, that he was aware of the witnesses defendant wanted to call, and that in his judgment it would not be beneficial to defendant to call them or to further cross-examine the prosecution witnesses. On one occasion the trial court adjourned the proceedings to allow additional consultation on the subject, and the public defender later indicated that nothing new had been disclosed. Defendant and the public defender also conferred during recesses at the trial.

An accused's right to counsel, of course, includes the right to consult with his counsel. (*Powell* v. *Alabama,* 287 U.S. 45 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527]; *Cornell* v. *Superior Court,* 52 Cal.2d 99, 102 [338 P.2d 447, 72 A.L.R.2d 1116]; *People* v. *Miller,* 185 Cal.App.2d 59, 77 [8 Cal.Rptr. 91].) Here it does not appear that defendant was denied that right. Rather it appears that defendant and the public defender differed on trial tactics and that the judgment of the public defender was fully vindicated when defendant, after discharging the public defender, recross-examined several prosecution witnesses and indicated the nature of the testimony he expected to elicit from other witnesses who were subpoenaed at his request. (The latter witnesses did not testify because defendant decided he was unable to continue

---

[4]After both sides rested at the guilt trial, defendant requested that the public defender be discharged and the case reopened. After discussion of the matter, the court granted the request. Later, before arguments at the guilt trial, defendant informed the court that he found he could not represent himself and had no funds to pay for his defense. The court inquired whether he objected to having the public defender reappointed, and defendant replied that he did not care. The court then reappointed the public defender to represent defendant.

representing himself, and the public defender, who was reappointed, did not want to call them.) Nothing substantially helpful to the defense was presented nor does it appear would have been presented had the additional witnesses been called, and some facts prejudicial to defendant were brought out on the recross-examination such as that he was an ex-convict and had escaped from the Deuel Vocational Institution.

Defendant next complains that he had ineffective aid of counsel because the public defender in his argument to the jury at the guilt trial stated that defendant admitted he was in the area at the time of the crime. Defendant asserts that there is no evidence of any such admission. However, in the tape-recorded conversation he made the statements previously recited from which an inference is clearly warranted that he was present at the scene of the crime. Rather than electing to ignore this evidence it appears that the public defender as a matter or trial tactics took the position ''[l]et's look at the evidence and let the chips fall where they may''—that defendant admitted he was in the area at the time of the crime but never admitted that he shot the victim or committed the burglaries.

Defendant further asserts he had ineffective aid of counsel because the public defender did not object to Mrs. Hodge's testimony on the ground that it violated the privilege for confidential marital communications. However, as we have seen, the privilege was inapplicable.

At the trial defendant was represented by a public defender who, according to the trial court, ''has tried many murder cases'' and is a ''very able, responsible, and experienced lawyer.'' In our opinion defendant's claim that he had ineffective aid of counsel cannot be upheld.

### Constitutionality of the Death Penalty

Defendant incorporates by reference the arguments made in *In re Anderson*, 69 Cal.2d 613 [72 Cal.Rptr. 21, 447 P.2d 1006], challenging the constitutionality of the death penalty. For the reasons stated in the *Anderson* opinion the arguments lack merit.

### Asserted Error in Excluding Veniremen Opposed to Capital Punishment

Thirteen veniremen were excused for cause on the basis of their reservations concerning the death penalty. Defendant asserts that most of them did not state they had ''such conscientious opinions as would preclude [their] find-

ing the defendant guilty,'' and he argues that they were therefore erroneously excluded because under Penal Code section 1074, subdivision 8, a challenge for implied bias does not exist if the venireman's assessment of punishment alone would be affected by his conscientious opinions regarding the death penalty.[5] The argument is devoid of merit. (*People* v. *Gonzales,* 66 Cal.2d 482, 497-499 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Riser, supra,* 47 Cal.2d 566, 575-576.)

The question remains whether the jury selection procedure comported with *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. The record discloses that under *Witherspoon* it was not error to exclude the 13 veniremen since the responses of each of them, when considered in their entirety, made it ''unmistakably clear (1) that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial . . . or (2) that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's *guilt*'' (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785]).[6]

---

[5]Penal Code section 1074 provides, ''A challenge for implied bias may be taken for . . . any of the following causes . . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty . . . .''

[6]Venireman Pobor was questioned: ''Q. [By the court] You indicated also, I believe, that you have some conscientious objections—opinion regarding the death penalty law . . . ? A. Yes, I do. Q. Do you want to indicate that you would find it impossible under any circumstances because of that opinion from bringing in either the death penalty or from making a finding of guilt . . . or do you know? A. It's a matter of conscience. I know as a juror what my job is. I would have to bring in whatever the decision in the case was. I would. rather not. . . . Q. [By the prosecutor] Now, you had indicated to the judge that you had some type of conscientious objection against the death penalty itself? A. Yes . . . Q. Is the conviction you have in your mind, is it a firm conviction that you feel? A. I feel the death penalty serves no purpose. Q. If it were up to you, if you were selected as a juror, after hearing the evidence in the case you would not render a verdict for the death penalty? A. I feel that if I'm chosen I would have to undergo that disturbance. I would rather not. . . . Q. . . . if you did sit as a juror on the death penalty phase, would you by conscience be required to return a verdict of life imprisonment? A. I'm afraid I would. . . . I would say life imprisonment, since I'm against the death penalty. . . . Q. [By defense counsel] And you at this time, do you feel that if the Court indicated that the matter was in your discretion, do you feel that there are no proper cases or there could be no proper cases for the imposition of the death penalty? A. There could not. I feel there could not. Q. And therefore under no circumstances could you return a verdict which would indicate the death penalty, if you were called upon to assess the penalty? A. No.''

Venireman McRae was questioned: ''Q. [By the court] Do you think you could be fair and impartial? A. . . . I don't believe in the death penalty. Q. . . . You, in other words, don't think it should be on the

*Conclusion*

The evidence is amply sufficient to support the verdict, and no claim is made to the contrary.

The judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., and Sullivan, J., concurred.

MOSK, J.—I concur in the substantive views expressed by Justice Burke in the majority opinion.

However, I also agree with that portion of the dissent of

books, is that it? A. Right. Q. But being that it is, do you think you are prepared to follow the law of . . . California? A. I will do my best. It's hard for me to say convincingly one way or the other, because I really don't know. Q. Well, because of this opinion you have regarding the death penalty, would you arbitrarily disregard its application? A. No, I would not. . . . Q. [By the prosecutor] . . . Now, do you think, after hearing what evidence has been offered in both trials, that because of your feelings you would be precluded from awarding the death penalty; and as you sit there now you would award a verdict of life imprisonment in preference to the penalty [*sic*]? A. I feel that would be my opinion, yes. . . . The Court: And under no circumstances would you award the death penalty? The Juror: I don't believe so, your Honor. The Court: Well, we want to know now. The Juror: No. . . . Q. [By defense counsel] And you feel—is it my understanding that you feel at . . . the penalty trial, you would be unable to assess the death penalty under any circumstances? A. Correct.''

Venireman Locke was questioned: ''Q. [By the court] Do you know of any reason why you could not serve in this case? A. I have some reservations about the death penalty. Q. What's your attitude on it? A. I'm against it. Q. All right. Notwithstanding your opposition to the death penalty law, are you prepared to follow that law should circumstances influence you that you should? A. Yes. . . . Q. [By the prosecutor] Now, do you have such conscientious objections to the death penalty that you feel that you would not be able to render such a verdict, whereas the alternative would be life imprisonment? Did you follow my question? A. Yes, I believe I do. Q. And what would your answer be? A. I would not vote for the death penalty. . . . Q. [By defense counsel] Is it your feeling that you could under no circumstances, even though the law now states that there is a death penalty . . . —did you state under no circumstances could you vote for a death penalty? A. I feel I couldn't. Q. You feel you could not under any circumstances? A. Yes.''

Venireman Jenkins was questioned: ''Q. [By the court] I believe you stated and raised your hand that you have some objection to the death penalty law? A. Yes. Q. Is that such that you would find it impossible to bring in a death penalty verdict? A. Yes, I think it is. Q. Under any circumstances? A. Under any circumstances. . . .''

Venireman Zufall was questioned: ''Q. [By the court] You indicated you had . . . some conscientious opinion regarding the death penalty law? A. Yes, sir. Q. You are opposed to it? A. (Nods head.) Q. Does that mean you could not, never apply it? A. I believe I just can't bring that into agreement with my religious convictions. Q. By reason of your religious convictions, you are opposed to the law and would under no circumstances follow it? A. Yes. . . . Q. You refuse to impose the death penalty under any circumstances? A. (Nods head.) . . . The Court:

Justice Peters relating to the discretionary power conferred upon this court by section 1181, subdivision 7, of the Penal Code, and I would be inclined to exercise the power in this case. The statute unequivocally provides the authority to

You realize . . . there's no guide by which the law tells you where you apply the death penalty. . . . It is discretionary with the jury . . . . Having that in mind, do you still find it impossible because of your conscientious objections and beliefs under any circumstances to even consider applying the death penalty? THE JUROR: I thought this through many years ago, your Honor, and I've held to it and I just can't bring myself to change it. I couldn't condemn another person to death."

Venireman Thomas stated that she had "reservations on the death penalty" and that they would preclude her from ever bringing in a death penalty verdict in any kind of a case.

Venireman Tabor stated that she would find it impossible to return the death penalty in any kind of a case because she had moral scruples against the death penalty law.

Venireman Beard was questioned: "Q. [By the court] And do you know of any reason why you couldn't serve as a fair and impartial juror? A. I have reservations on the death penalty. Q. Well, will you state what they are? A. Well, I'd rather not—I don't believe I could inflict that. . . . Q. Do you feel that you would be able—unable to even exercise the discretion of imposing either the death penalty or life imprisonment? A. I think so. Q. Are you certain in your mind? A. I think so, yes. Q. Under no circumstances would you impose the death penalty? A. No. . . . Q. [By defense counsel] . . . if there was no obligation on you to assess the penalty, could you determine . . . the degree of the crime . . . ? A. I think so. . . . THE COURT: Would you have any problem with that, knowing that should you determine it to be first degree murder— THE JUROR: Well, I don't know. THE COURT: —that thereafter consideration must be given to a life or death type of sentence? THE JUROR: Well, as long as there was a choice between life and death, it would be all right. THE COURT: If you had a choice— THE JUROR: There would be— THE COURT: Would you consider both? THE JUROR: I think so. THE COURT: Life or death? THE JUROR: Uh-huh. THE COURT: And notwithstanding your attitude toward the death penalty, you would give consideration to both, depending upon your impression? THE JUROR: Well, it would depend upon the arguments and the evidence. . . . Q. [By the prosecutor] I understood you, Mr. Beard, that you yourself could not award the death penalty? A. I don't believe I could. Q. And would that be in almost any type of case? A. I think so. . . . Q. You are opposed to the death penalty as such? A. Yes. Q. And you feel in any case you could not award the death penalty? A. No. . . . THE COURT: Well, you say, Mr. Beard, you don't think you could. That leaves it open to possibility that you could. We'd like to know whether or not you have such a conviction in your mind that you absolutely would not or whether you would consider depending upon all of the circumstances? THE JUROR: I don't think that I would consider it. THE COURT: Because of your conviction? THE JUROR: That's right."

Venireman Sahary stated that she was opposed to the death penalty and that notwithstanding the circumstances of the case she would refuse to vote for that penalty.

After Venireman Thurston stated that she entertained objections to the death penalty law, she was asked "Are you indicating . . . that under no circumstances would you as a juror impose it because you are opposed to it in theory?" and she replied, "Right."

Venireman Weaver stated that he had an objection to capital punishment. Questioning ensued regarding that objection, and, after he was informed that the choice between the two penalties was in the jury's

modify a judgment "by imposing the lesser punishment without granting or ordering a new trial" not only to trial courts, but also "this power shall extend to any court to which the case may be appealed." Since the Supreme Court is the *only* court to which the case is appealed when the death penalty is imposed, it seems undebatable that the Legislature intended the power to extend to this court. As Justice Holmes taught us nearly a century ago, "There is a strong presumption in favor of giving words their natural meaning and against reading them as if they said something else." (*Merrill* v. *Preston* (1883) 135 Mass. 451, 455.)

As recited in the dissent, there is a long line of cases based upon *People* v. *Odle* (1951) 37 Cal.2d 52 [230 P.2d 345], holding that, absent error affecting the penalty determination, this court will not interfere with a judgment of death. Conceding, as I must, that this series of cases exists, I cannot join in holding that error becomes sanctified and unassailable merely by constant repetition. The doctrine of stare decisis includes no such command.

The court in *Odle* based its construction that this court had no power to reduce the punishment, on the ground inter alia that "To construe the section otherwise would give the court clemency powers similar to those vested in the Governor (Cal. Const., art. VII, § 1), and raise serious constitutional questions relating to the separation of powers." (*Id.* at p. 58.)

Reduction of a sentence by a court is clearly a judicial

---

discretion and that the law gives no guide, he was asked, "And knowing that do you feel that your convictions are such that you would not even consider it in the alternative, of the death as contrasted with life imprisonment? A. I feel, yes that I wouldn't consider it. Q. You absolutely would impose only the life imprisonment? You wouldn't give consideration for death? A. I don't feel that I could, no. . . ."

Venireman Inderkum stated that she was opposed to the death penalty and would not even consider its imposition because of her attitude.

During *voir dire* of Venireman Freitag the following occurred: "Q. You think you could serve in a fair and impartial capacity? A. I don't agree with capital punishment. Q. With that disbelief, if its application in California prevents you from imposing it, you could not impose it under any circumstances? A. Yes. . . . Q. [By defense counsel] . . . does this problem arise only in the assessment of penalty? A. Yes. Q. Do you feel that if you were not required to assess the penalty that you could determine the guilt or innocence in this matter? A. Yes. Q And do you feel that you could also determine the degree of offense . . . if you yourself were not required to assess the penalty? A. Yes. . . . THE COURT: Even knowing that thereafter, if you brought in a first degree murder finding— THE JUROR: I misunderstood the question. No, not if my decision were the proximate cause. THE COURT: That would lead to a finding that would have to be made by another body, a choice between life and death imprisonment or otherwise death [*sic*], would that interfere with your ability to render a fair and impartial judgment? THE JUROR: Yes, in that context, it would."

function. That the Governor is authorized to exercise a similar act in the form of clemency does not make it any less a judicial function. If there is any deviation from traditional separation of powers, it arises because the Constitution confers that one ''judicial'' power upon the Chief Executive. Nothing therein provided suggests, however, that similar statutory authority resting in the courts interferes with normal separation of powers, for the courts merely continue to exercise no executive function but only conventional judicial power. In holding otherwise, *Odle* was in error, and subsequent cases relying upon it as precedent compounded the error. (See dissent by Schauer, J., in *People* v. *Odle,* 37 Cal.2d at p. 61 [230 P.2d 345].)

I am not unmindful of the fact that whenever this court chooses to adopt the correct interpretation of section 1181, subdivision 7, we will ''stand at the threshold of a previously unopened door'' (Murphy, J., dissenting in *Associated Press* v. *United States* (1945) 326 U.S. 1, 59 [89 L.Ed. 2013, 2051, 65 S.Ct. 1416]), and we may be inundated with petitions for habeas corpus inviting us to exercise discretion anew in cases long since final. I do not deem that potentiality to be crucial, however, for this court has no obligation to reopen cases decided under a previously prevailing interpretation of the law. Retroactivity is properly frowned upon as imposing ''burdens upon the administration of criminal justice'' when it results in the reconsideration of ''cases that were correctly decided under the law in force at the time of trial.'' (*In re Lopez* (1965) 62 Cal.2d 368, 381 [42 Cal.Rptr. 188, 398 P.2d 380].) It must also be noted that we have here no federal or state constitutional imperative, and no issue of prejudicial error as in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal. Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810] (applied retrospectively in *In re Jackson* (1964) 61 Cal.2d 500 [39 Cal.Rptr. 220, 393 P.2d 420]), but merely interpretation of a discretionary penal statute. Under that code section I would exercise our statutory power to reduce punishment only prospectively, in cases deemed appropriate.

PETERS, J.—I dissent. The judgments should be reversed, or, at least, the judgment of death should be reduced to life imprisonment.

In the first place, the judgment should be reversed because the tape-recorded conversation with the witness Colvin was inadmissible, and its admission constituted prejudicial error.

Colvin was a police agent. His interrogation of defendant was equivalent to interrogation by the prosecuting attorney or the police. Had this interrogation been carried on by the prosecuting officials directly without giving the *Escobedo-Miranda* warnings there can be no doubt it would have constituted prejudicial error. The fact an agent was used does not change the rule.

Two weeks before the taped conversation was secured the prosecution had detailed information from Mrs. Hodges, Colvin, and Mrs. Long that defendant had committed the murder. They had more than sufficient information to arrest defendant. No longer were they simply investigating a possible crime. Suspicion had directly focused on defendant, and on defendant alone. The inference is clear that the prosecution arranged for the tape-recorded conversation in an attempt to secure further evidence of guilt from the suspect's own mouth. This violates the basic policy of the *Escobedo-Miranda* cases, and of the many other cases interpreting them. That policy is to prohibit basically unfair tactics in the interrogation of a defendant and to prevent coercion, direct or indirect. To use psychological pressure in interrogating a defendant, directly or indirectly, without the warnings required by law and through a police decoy two weeks after they have accumulated evidence of defendant's guilt, after suspicion had focused on defendant, and after the police had ample cause to arrest is to employ the very same unfair tactics denounced in *Escobedo* and *Miranda*.

*Escobedo* and *Miranda* clearly established that the privilege against self-incrimination and the right to counsel apply to police interrogation prior to indictment and trial and that confessions and admissions secured prior to trial in violation of the privilege or the right must be excluded. Those cases are not limited to interrogations which take place in the police station or jail but they extend to interrogations designed to elicit admissions and confessions once suspicion has focused upon the defendant. We have recognized that the rules established by these cases are applicable in the absence of arrest or confinement. Thus in *People* v. *Arnold,* 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515], we pointed out that a person, although not physically deprived of his freedom, should be viewed as such if he has been led to believe as a reasonable person that he is so deprived. Similarly, in *People* v. *Furnish,* 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299], we pointed out that in the absence of arrest all of the circum-

stances surrounding the making of the defendant's statement must be considered, and specifically emphasized "factors which may subject the suspect to unusual pressures." (See also *People* v. *Chaney,* 63 Cal.2d 767, 769 [48 Cal.Rptr. 188, 408 P.2d 964].)

One cannot read the lengthy and detailed discussion in *Miranda* (384 U.S. at pp. 448-456 [16 L.Ed.2d at pp. 708-713]) of improper police practices employed to elicit admissions and confessions from accuseds reluctant to speak, without recognizing that the basic concern of the court was to protect the privilege against self-incrimination and the right to counsel from subversion by unfair police methods. The instant case reflects unfair police methods used to compel defendant to make admissions. The fact that those methods may have been more subtle than the ones discussed in *Miranda* is immaterial. We should not permit such methods to subvert our basic constitutional guarantees.

*Miranda* was expressly and directly concerned with psychological pressures used by police officers to make a suspect talk whether or not he freely and voluntarily wanted to talk, and the court adopted safeguards to protect the privilege against self-incrimination and the right to counsel. Although *Miranda* involved a defendant in physical custody of the police, the same rules also apply where the police subtly or obviously use the same or similar psychological pressures to obtain admissions or confessions from a suspect upon whom suspicion has focused. Once suspicion has focused law enforcement officials should not be permitted to avoid the rules established by *Miranda* to protect our constitutional guarantees by resort to subtle but coercive psychological pressures to compel the suspect to make admissions and confessions where there has been no waiver of the privilege against self-incrimination or of the right to counsel.

In the instant case, the ploy used by the law enforcement officials was as psychologically coercive as those discussed with disapproval in *Miranda*. Prior to the interview by Colvin, defendant had learned that Mrs. Hodges had complained of a threat made by him, and his parole had been subject to question. The plan as reflected by the 45-minute conversation between Colvin and defendant was that Colvin would come to defendant telling him that a Los Angeles police officer had tried to reach him but that Colvin had not returned the officer's call but had called his mother who said the call from the police may have related to defendant. Colvin told defend-

ant that he had heard a rumor that defendant killed a police officer and asked whether this related to Sacramento. Colvin also stated that he was worried that the call from the officer may have related to that rumor. Even if innocent of the killing, defendant, a parolee, would realize the threat to his freedom due to the rumor, would think that he must say or do something to stop the spread of the rumor, and since Mrs. Hodges had recently made a complaint to the parole authorities, he must act to prevent her from further spreading such rumors.

As might be expected, defendant reacted by telling Colvin, Mrs. Hodges' son, that "if I go, she is going with me." Interestingly enough, the threat when first detailed did not relate to the Sacramento murder at all but to an assertion that Mrs. Hodges had killed defendant's first wife. It was only after that that he made admissions regarding the Sacramento murder, and those admissions were made in the context of a threat to Mrs. Hodges based on her complicity in the crime.

It is clear from the testimony of the police officers that the entire purpose of the conversation between Colvin and defendant was to secure a confession. The case differs from *Hoffa* v. *United States*, 385 U.S. 293, 309-310 [17 L.Ed.2d 374, 386-387, 87 S.Ct. 408], where the undercover police agent was not interrogating the defendant to obtain admissions or confessions of past criminal conduct but was seeking to determine whether the defendant was presently engaged in an attempt to commit, or the commission of, a crime.[1] In *People* v. *Ing*, 65 Cal.2d 603, 613 [55 Cal.Rptr. 902, 422 P.2d 590], and *Ballard* v. *Superior Court*, 64 Cal.2d 159, 170 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], it does not appear whether the police agents used psychological pressures to obtain the incriminating statements, and the cases are factually distinguishable. However, I would disapprove them insofar as they state or hold that *Escobedo* and *Miranda* are inapplicable in the absence of custody.

It seems clear the admissions were improperly secured and their admission into evidence constituted reversible error. Even if the tape-recorded conversation were admissible, however, in my opinion, this is a proper case to exercise the discretionary power conferred by section 1181, subdivision 7 of the Penal Code and reduce the penalty to life imprisonment.

---

[1] It should be pointed out that the United States Supreme Court has ordered further hearing in the *Hoffa* case. (*Giordano* v. *United States*, 394 U.S. 310 [22 L.Ed.2d 297, 89 S.Ct. 1164].)

Just as there are no standards governing the fixing of the penalty by the jury (*In re Anderson* and *Saterfield,* 69 Cal.2d 613, 621-623 [73 Cal.Rptr. 21, 447 P.2d 117]), or the trial judge, there are no statutory standards to regulate the discretion of this court. Each case must be decided upon the record according to the conscience of each judge.

In the instant case the following factors are important. The killing occurred 13 years before defendant's connection with it was discovered. Then it was discovered because Mrs. Hodges and her daughter and son came to the district attorney and told their stories. Admittedly, Mrs. Hodges had lived with defendant, in a common law relationship, had quarreled with defendant and married another man. There was bad blood between them. Her testimony and the testimony of her two children are suspect. The tape recording was, to say the least, of doubtful value. The testimony of first degree murder while technically sufficient, was of but doubtful weight. If we do have a discretionary power under section 1181, subdivision 7 of the Penal Code this case is a proper one in which to exercise that power. (Cf. *People* v. *Terry,* 61 Cal.2d 137, 146 [37 Cal.Rptr. 605, 390 P.2d 381].)

The language of section 1181, subdivision 7, is crystal clear. It confers on this court the same power conferred on trial courts to reduce the death penalty to life. It is well settled that it confers discretionary power on trial courts. The matter is that simple.

Section 1181 of the Penal Code provides that the trial court may grant a new trial when, inter alia, "the verdict or finding is contrary to law or evidence, . . ." (Subds. 6 and 7.) Subdivision 6 of that section provides that if this condition exists but the evidence shows the defendant to be guilty of a lesser degree of the crime of which he was convicted or of a lesser included offense, the court may modify the verdict, finding, or judgment accordingly without granting a new trial. The subdivision further provides that "this power shall extend to any court to which the cause may be appealed."

Subdivision 6 has been interpreted as requiring the trial court to make an independent review of the evidence and to reduce the degree or crime where it determines that the weight of the evidence dictates such action. (E.g., *People* v. *Moore,* 53 Cal.2d 451, 454 [2 Cal.Rptr. 6, 348 P.2d 584]; *People* v. *Sheran,* 49 Cal.2d 101, 108-109 [315 P.2d 5].) However, while an appellate court under subdivision 6 is given the

same power as the trial court, the circumstances justifying its exercise in accordance with the typical functioning of appellate courts[2] are narrower than those justifying action by the trial court. Thus, an appellate court will, upon application to reduce the degree or class of an offense, consider only the sufficiency of the evidence as a matter of law to support the determination of degree or class at the trial level. (*People* v. *Sheran, supra.*)

These same arguments do not apply with equal force to subdivision 7 of the section. Subdivision 7 of section 1181 provides that "[w]hen the verdict or finding is contrary to law or evidence," and if the case before it is one in which "authority is vested by statute in the trial court or jury to recommend or determine . . . the punishment to be imposed, the [trial] court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed." Subdivision 7 requires the trial court in a case in which the jury has imposed the death penalty to review the evidence independently and to reduce the penalty to life imprisonment if in its own independent judgment the death penalty was not proper. (E.g., *People* v. *Love*, 56 Cal.2d 720, 728-729 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)

Since the trier of fact in a capital case is neither bound nor guided in making its decision regarding penalty except in two types of cases discussed hereinafter, the power of the trial court under subdivision 7 is obviously a different, more discretionary power than that which it possesses under subdivision 6.

The question which has not been explored satisfactorily by this court is the nature and scope of this court's power[3] under subdivision 7.

In a long line of cases based upon *People* v. *Odle*, 37 Cal.2d 52 [230 P.2d 345], which was decided prior to the enactment

[2]The fact finding power, although not normally exercised by appellate courts, is not unknown to them. Where a referee is appointed, usually in habeas corpus proceedings, he hears and sees the witnesses and makes findings, but his findings even though based on conflicting evidence are not binding on the appellate courts. They must weigh the evidence and make an independent judgment on the facts. Also in determining whether or not an error is prejudicial, under article VI, section 13 of the California Constitution, the appellate court must weigh the evidence. Other instances of fact finding by the appellate court exist.

[3]This court has exclusive and automatic appellate jurisdiction in cases in which the judgment of death has been pronounced. (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

of subdivision 7 of section 1181 and involved a construction of section 1260, this court has held that absent error affecting the penalty determination in a capital case it will not interfere with that determination since it has "no power to substitute its judgment as to choice of penalty for that of the trier of fact." (*In re Anderson* and *Saterfield, supra,* 69 Cal.2d 613, 623; *People* v. *Lookadoo,* 66 Cal.2d 307, 327 [57 Cal.Rptr. 608, 425 P.2d 208]; *People* v. *Mitchell,* 63 Cal.2d 805, 821 [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Welch,* 58 Cal.2d 271, 275 [23 Cal.Rptr. 363, 373 P.2d 427]; *People* v. *Love, supra,* 56 Cal.2d 720, 728; *People* v. *Howk,* 56 Cal.2d 687, 700 [16 Cal.Rptr. 370, 365 P.2d 426]; *People* v. *Lindsey,* 56 Cal.2d 324, 328 [14 Cal.Rptr. 678, 363 P.2d 910]; *People* v. *Monk,* 56 Cal.2d 288, 300 [14 Cal.Rptr. 633, 363 P.2d 865]; *People* v. *Rittger,* 54 Cal.2d 720, 734-735 [7 Cal.Rptr. 901, 355 P.2d 645]; *People* v. *Moore, supra,* 53 Cal.2d 451, 454; *People* v. *Cash,* 52 Cal.2d 841, 845 [345 P.2d 462]; *People* v. *Linden,* 52 Cal.2d 1, 26-27 [338 P.2d 397]; *People* v. *Feldkamp,* 51 Cal.2d 237, 241 [331 P.2d 632]; *People* v. *Borchers,* 50 Cal.2d 321 [325 P.2d 97]; *People* v. *Brust,* 47 Cal.2d 776, 792 [306 P.2d 480]; *People* v. *Green,* 47 Cal.2d 209, 235 [302 P.2d 307]; *People* v. *Carmen,* 43 Cal.2d 342, 351 [273 P.2d 521]; *People* v. *Byrd,* 42 Cal.2d 200, 213 [266 P.2d 505]; *People* v. *Ortega,* 41 Cal.2d 621, 622 [262 P.2d 2]; *People* v. *Sutic,* 41 Cal.2d 483, 493 [261 P.2d 241]; *People* v. *Harrison,* 41 Cal.2d 216, 219 [258 P.2d 1016]; *People* v. *Dessauer,* 38 Cal.2d 547, 555 [241 P.2d 238]; cf. *People* v. *Talbot,* 64 Cal.2d 691, 712 [51 Cal.Rptr. 417, 414 P.2d 633]; *People* v. *Ashley,* 59 Cal.2d 339, 365 [29 Cal.Rptr. 16, 379 P.2d 496].)

Although none of these cases purports to derive this rule from the language of subdivision 7 of section 1181, the majority would apparently nonetheless hold that subdivision 7 has been construed by reiteration and, since some of the later cases refer to the power of the *trial court* under subdivision 7, by implication. If this rule is both interpreted expansively and held to define the power granted to appellate courts in subdivison 7, that power will be largely limited to cases where its exercise seems, absent peculiar circumstances,[4]

___

[4]One conceivable situation in which the power granted to appellate courts under subdivision 7 might appropriately be exercised in a case where retrial on the issue of penalty would otherwise be required is that in which a defendant has received a number of death sentences, each of which has been reversed due to some prejudicial error on the part of the prosecution. At some point this court might well decide that the prosecution should forfeit the possibility of obtaining a legitimate death sentence and be content with a life sentence.

inappropriate—cases involving prejudicial error affecting the penalty determination, such as an improper reference to the possibility of parole for the defendant if he is sentenced to life imprisonment. Ordinarily, however, the appropriate action in such cases is to order a new trial on the issue of penalty so that the legislative objective of having punishment determined by the trier of fact in a fair proceeding can be carried out. Furthermore, a broad application of this rule would contravene the explicit language of subdivision 7 which gives both trial and appellate courts *some* power to reduce punishment in cases where the trier of fact determines or recommends the punishment and where the verdict or finding is "contrary to law or evidence."

In a case decided several years after the enactment of subdivision 7 of section 1181 but which does not cite section 1181, this court recognized that it has at least *some* power to reduce a death sentence imposed by the trier of fact to life imprisonment when the verdict is "contrary to . . . [the] evidence." In *People* v. *Jackson,* 44 Cal.2d 511 [282 P.2d 898], we held that the trier of fact improperly imposed the death penalty under section 209 of the Penal Code, prescribing punishment for kidnaping for ransom, reward, extortion or robbery, because there was insufficient evidence of bodily harm, the existence of which is a prerequisite to consideration of death as a possible penalty under that section.[5] We directed the trial court to sentence the defendants to life imprisonment, the appropriate penalty in the absence of bodily harm.

It would be unreasonable to limit this court's power under subdivision 7 of section 1181 to reduce sentences "contrary to . . . [the] evidence" to cases in which the evidence is insufficient as a matter of law to establish the existence of some fact specified by the Legislature as a prerequisite to consideration or imposition of the death penalty. First, there are apparently only two types of cases in this category: kidnaping cases such as *Jackson* arising under section 209 of the Penal Code and cases of aggravated assaults by life prisoners arising under section 4500 of the Penal Code.[6] It is unlikely

[5]Section 209 provides that a kidnaper punishable under that section shall be punished by death or by life imprisonment without possibility of parole in the discretion of the jury, in cases in which the person or persons subjected to such kidnaping suffers or suffer bodily harm, but that in cases not involving bodily harm to such person or persons the punishment shall be life imprisonment with possibility of parole.

[6]Section 4500 provides that every person undergoing a life sentence in a California state prison who, with malice aforethought, commits an assault of the type proscribed in section 245 of the Penal Code shall be

that the Legislature intended its broadly worded grant of power to appellate courts in subdivision 7 to be confined to these limited types of cases and not to apply at all to first degree murder cases arising under sections 187-190 of the Penal Code.

Since the trial court necessarily has a more discretionary power under subdivision 7 than it does under subdivision 6 in capital cases, there being no standards to govern the trier of fact in determining penalty except in cases arising under sections 209 and 4500 of the Penal Code, it seems only logical that the power granted to this court under subdivision 7 is a more discretionary power than that which it possesses under subdivision 6. Accordingly, it is most reasonable to construe this court's power under subdivision 7 as being a limited power to impose life imprisonment rather than the death penalty in cases where, in its judgment, the trier of fact has abused its discretion in imposing the death penalty—i.e., in cases where in its judgment the evidence *should* be considered insufficient to warrant the death penalty, even though the Legislature has not explicitly forbidden its imposition in such (possibly unforeseeable) circumstances.

Thus construed, subdivision 7 embodies a legislative mandate for this court to cautiously provide an appellate-level check upon rare cases of clearly abusive imposition of the death penalty. For example, this court might conclude that in a particular case where a defendant has committed first degree murder under overwhelmingly mitigating circumstances, has clearly exhibited remorse for his deed, and shows definite promise for rehabilitation, he not only should not (a determination entrusted solely to the trial court upon review under subdivision 7) but must not (under the broadest possible latitude for the exercise of discretion by the trier of fact) be sentenced to death under existing legislation.

The suggested construction of this court's power under subdivision 7 of section 1181 of the Penal Code is not inconsistent with the numerous cases holding that this court has "no power to substitute its judgment as to choice of penalty for that of the trier of fact" if that phrase is reasonably interpreted to mean only that this court may not make an

sentenced to death, except that if the person assaulted either is an inmate or does not die within a year and a day after the assault as a proximate result thereof then the punishment shall be death or life imprisonment without possibility of parole for nine years in the discretion of the trier of fact.

independent de novo judgment as to the appropriate penalty as the trial court may, indeed' must, do. Nor would this court's power under subdivision 7 amount to the exercise of a clemency function, which would arguably give rise to a constitutional problem of separation of powers. (See *People* v. *Odle, supra,* 37 Cal.2d 52, 58.) The exercise of clemency is not a review of judicial proceedings but an exercise of grace and compassion. (*Andrews* v. *Gardiner,* 224 N.Y. 440, 447 [121 N.E. 341, 2 A.L.R. 1371] [Cardozo, J.], *Editors' Forum* (1967) 55 Cal.L.Rev. 407, 412.) .

For these reasons I am of the opinion that we should exercise in this case the discretionary power conferred by section 1181, subdivision 7 of the Penal Code and reduce the penalty to life imprisonment.

I would reverse the judgment because of the admission of the tape-recorded conversation with Colvin, but in any event this is a proper case to exercise the power granted by section 1181, subdivision 7, to reduce the penalty to life imprisonment.

Appellant's petition for a rehearing was denied August 20, 1969. Peters, J., was of the opinion that the petition should be granted.